## THE NEBRASKA.

### Appeal of MILWAUKEE DRY DOCK CO.

(Circuit Court of Appeals, Seventh Circuit. October 7, 1895.)

No. 191.

1. MARITIME LIENS—WAIVER—GIVING SECURITY.
   A maritime lien is waived by accepting notes or other securities extending the time of payment beyond the time within which, by the general maritime law or by statute, the lienor is allowed to enforce the lien.

2. SAME—STALE LIENS—VESSELS ON THE GREAT LAKES.
   In respect to vessels navigating the Great Lakes, the general maritime rule limiting the time within which a lien must be enforced to the particular voyage has been modified so as to fix the limitation by the seasons of navigation.

3. SAME—WAIVER—TAKING MORTGAGE AND NOTES.
   Where one having a maritime lien upon a vessel navigating the Great Lakes libeled her, and had her taken in custody, but afterwards voluntarily released her and dismissed the libel, by agreement with her owner and her mortgagees, accepting a mortgage and notes extending the time of payment 18 months, which would carry it beyond the close of the season of navigation following that in which she was at the time engaged, *held*, that this was a waiver of the maritime lien as to subsequent innocent lienors, notwithstanding that the notes contained an express provision that the lien should not be waived, which provision, however, was not incorporated in the mortgage.

Appeal from the District Court of the United States for the Northern District of Illinois.

This was a libel by Frank Hoffman against the steam propeller Nebraska to enforce a lien for supplies. Various parties intervened, asserting claims against the vessel, among them the Milwaukee Dry Dock Company. This company filed exceptions to the order of distribution recommended by the master's report, and the exceptions being overruled, and a decree being entered, postponing its claim to

others which absorbed all the proceeds (61 Fed. 514), it appealed the cause to this court.

* In April, 1892, the steamer Nebraska, a freight boat built in 1868, enrolled at the port of Buffalo, was owned by Hume, Galvin & Tyler. In that month they sold the steamer to Edward D. Comings, of Chicago, for the sum of $40,000, taking upon the vessel to secure $37,000 of the purchase money, a mortgage duly recorded in the office of the collector of customs at the port of Buffalo. Comings purchased the vessel with the purpose of changing her into a passenger boat to carry passengers during the World's Columbian Exposition at Chicago, from the port of Chicago to the exposition grounds. Upon the purchase the vessel proceeded from the port of Buffalo to the port of Chicago. Prior to her arrival at the port of Chicago, the appellant, the Milwaukee Dry Dock Company, learning of the purchase and its object, entered into negotiations with Comings at the city of Chicago to make the necessary alterations in the vessel at its dry dock at the city of Milwaukee, and an agreement was arrived at by which the steamer was to be sent to Milwaukee to have the necessary changes made at the dry dock of the Milwaukee Dry Dock Company. About the 1st day of May, 1892, the vessel proceeded in ballast to Milwaukee, and upon her arrival was placed in the dry dock and stripped. Extensive repairs and alterations were found to be necessary to render her fully seaworthy and fit for a passenger boat, and were made at a cost of some $15,623.25, upon which a payment of $1,000 only was made. There is testimony tending to show that, prior to these repairs, and before the boat had left Chicago for Milwaukee, the president of the Milwaukee Dry Dock Company, upon inquiry, learned that Comings was pecuniarily irresponsible, and the company declined to extend credit for the work, and that afterwards, and about the time of the commencement of the work, Comings agreed that the company should have a lien upon the vessel for the work to be done upon her. About the 25th day of July the company allowed Comings to sail the boat to Ludington upon an excursion, upon his promise to return her to Milwaukee, which he did. On the 27th day of July, 1892, the Milwaukee Dry Dock Company exhibited a libel against the vessel in the district court of the United States for the Eastern district of Wisconsin to establish a maritime lien upon the vessel for the value of the changes and repairs so made by the company. The vessel was arrested on that day by the marshal upon process issued upon the libel, and remained in his custody until August 20th, 1892, when the libel was dismissed and a warrant of restitution was ordered to issue.

Soon after the arrest of the vessel the mortgagees, Hume, Galvin & Tyler, had a conference at Milwaukee with Comings and the Milwaukee Dry Dock Company, and it was thereupon agreed, on the 20th day of August, 1892, that Comings should, and he did, give the mortgagees a bill of sale of the boat, which had been enrolled at the port of Chicago on the 12th day of July, 1892, and they on their part agreed to give the Milwaukee Dry Dock Company their promissory notes, secured by a mortgage upon the steamer, for the amount due to that company, which should be payable in three installments, on or before the 6th days of July, September, and December, 1893, respectively, with interest. Hume, Galvin & Tyler agreed with Comings to extend the time of payment of the notes given by Comings to them; to pay, or postpone the payment of all other claims upon the vessel; that the vessel should be employed in the excursion and passenger business in and about the city of Chicago so long as she profitably could be under the direction and management of Comings, but that they should employ a purser who should receive the earnings of the boat and apply the same, first to her running expenses, and the balance to a trustee named, to be paid by him on account of the debt to the dry dock company so assumed by them. In pursuance of that agreement Hume, Galvin & Tyler executed and delivered to the Milwaukee Dry Dock Company their three several promissory notes,—one for $5,545.53 payable on or before July 1, 1893, one for $5,000 payable on or before September 1, 1893, and one for $5,000 payable on or before December 1, 1893; each of such notes containing the following: "It is agreed and understood by and between the makers and payee of this note that the same is given in consideration of

work and material furnished and done for the propeller 'Nebraska' for which material and labor the Milwaukee Dry Dock Co. has a lien for the value thereof. And it is further agreed by and between the makers of this note and the payee that the payee, by accepting this note and extending time of payment of their demand, in no wise waives its lien upon said vessel for the said work and material so done and furnished to the said propeller 'Nebraska' aforesaid. This note is secured by a mortgage upon the said propeller 'Nebraska' of even date herewith. It is also agreed between the makers and payee of this note that in case the said propeller 'Nebraska' shall be attached and sold upon any claim before this note becomes due, then and in that case this note shall become immediately due and payable." The mortgage given to secure these notes contained no reference to the agreement quoted from the note with respect to the nonwaiver of the lien upon the vessel by reason of the acceptance of the note. This mortgage was recorded at the port of Buffalo, the residence of the mortgagors, on the 22d day of August, 1892.

Upon the consummation of the agreement and the execution and delivery of the notes' and mortgage, the libel was dismissed upon the motion of the libelant, the appellant here, and possession of the vessel was surrendered pursuant to the agreement. The steamer thereafter continued to run in and out of the port of Chicago until July 3, 1893, when a libel was exhibited against the vessel in the district court of the United States for the Northern district of Illinois by one Frank Hoffman to recover for supplies furnished the vessel in April and May, 1893. The steamer was arrested upon process issued upon that libel and sold on the 19th day of September, 1893, upon a writ of venditioni exponas issued out of that court, for the sum of $13,000, to one A. M. Joy, and the proceeds covered into the registry of the court. A number of claims for supplies furnished subsequently to the 20th of August, 1892, were presented to the court, and on the 11th day of October, 1893. the Milwaukee Dry Dock Company filed its intervening petition setting forth its claim as above stated, and copies of the notes executed by Hume, Galvin & Tyler, and also certain other claims for advances not here in controversy, and praying for the payment of its claim out of the proceeds of the sale of the vessel. It is asserted in this petition that the last date of furnishing materials by the dry dock company to the steamer Nebraska was July 21, 1892. On the 8th day of November, 1893, the Independent Fuel Company, furnishing supplies during the season of 1893 filed objections to the demand of the Milwaukee Dry Dock Company, setting forth the facts substantially as above stated, and claimed— First, that the alterations and changes were in fact a reconstruction of the vessel, and that the cost is not by the maritime law a lien upon the vessel or her proceeds; and, secondly, that any supposed lien for the repairs became merged in the mortgage and notes given for the claim by Hume, Galvin & Tyler, and that the Milwaukee Dry Dock Company was entitled to rank in distribution simply as a mortgagee. A certain other claimant filed similar exceptions to the allowance of the claim of the Milwaukee Dry Dock Company. The matter of the classification of the claims filed against the proceeds was referred to a master, who reported that certain claims for wages to the amount of $675.08 were entitled first to be paid; secondly, certain foreign claims, to the amount of some $10,000 should be next paid; and, thirdly, claims ranking as domestic claims, among which was included that of the Milwaukee Dry Dock Company for the changes and repairs before referred to. The Milwaukee Dry Dock Company filed exceptions to the report, insisting that its claim should be classed as a foreign demand, and rank as a maritime lien against the fund, and be preferred to all claims and demands except those of equal rank contracted during the season of 1892 in the port of Milwaukee. The court overruled the exceptions, and directed distribution of the fund substantially in accordance with the master's report, from which ruling this appeal is taken; the Milwaukee Dry Dock Company insisting by its assignment of errors that the court erred in not placing its claim and demand on the footing of a foreign lien, and in classifying it as a domestic lien.

George C. Markham, for appellant.

William H. Condon, George C. Fry, O. E. Kremer, Abram M. Pence, George A. Carpenter, and Robert Rae, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge, after statement of the foregoing facts, delivered the opinion of the court.

Upon the assumption that the contract with respect to the repairs and alterations of the Nebraska was maritime in character, and that by express agreement with the owner the appellant was accorded a maritime lien upon the vessel therefor,—questions which we do not determine,—and that the work was performed in a foreign port, we are yet of the opinion that the appellant, under the circumstances of the case, ought not to be permitted to share in the distribution of the proceeds arising from the sale of the vessel, upon equality with claims subsequently arising against the vessel. There are certain principles established in the admiralty by which, as we think, the allowance or disallowance of this claim should be judged, and which should be stated and considered before passing to the peculiar circumstances under which this claim is presented.

It is to be observed that continuing secret liens upon vessels are discouraged in the admiralty, because they tend to encumber commerce. While doubtless such liens are necessary aids of navigation, it is equally true that they should not be permitted to be unduly and unnecessarily extended, nor allowed to remain dormant and unknown, to the injury of innocent third persons. It was asserted by Judge Betts, more than half a century ago, "that it is a principle common to the maritime law, wherever it is administered, that all liens upon vessels are temporary and evanescent, and cannot be continued any longer than until a reasonable opportunity has been offered for their enforcement." The Utility, 1 Blatchf. & H. 218, Fed. Cas. No. 16,806. Courts of admiralty, equally with courts of equity, demand vigilance in the assertion of rights. Where the rights of others have intervened, a claimant may not remain inactive with respect to the assertion of his claim, and cannot be permitted to unduly extend the time of its payment. He cannot be allowed, by his conduct or by his silence, to induce or allow innocent parties to part with their property upon the credit of the vessel, and as against such claims to assert a dormant lien. It was well asserted in The Lillie Mills, Spr. 307, Fed. Cas. No. 8,352, that "when the rights of third persons have intervened the lien will be regarded as lost, if the person in whose favor it existed has had a reasonable opportunity to enforce it and has not done so. It is the well-settled rule in admiralty." So, also, the principle is declared in The Key City, 14 Wall. 653, 660, that laches or delay in the judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defense. The effect to be given to the delay depends upon the peculiar circumstances of the case. The cases are numerous which support and follow this doctrine. Many of them will be found assembled in The Bristol, 11 Fed. 156.

It is true that it has been held that one does not waive his lien by the mere fact of taking the promissory note of his debtor for the claim. Most of the cases to which we were referred upon that point seem to proceed upon the doctrine that, to enable the claimant under such

circumstances to assert his lien, the note received should be surrendered (Ramsey v. Allegre, 12 Wheat. 611; Andrews v. Wall, 3 How. 573; The Kimball, 3 Wall. 45; The Emily Souder, 17 Wall. 666, 670; The St. Lawrence, 1 Black, 523, 531; The Eclipse, 3 Biss. 99, Fed. Cas. No. 4,268), unless possibly the note is valueless (The Bird of Paradise, 5 Wall. 545, 561). We cannot perceive the force of the reason for the surrender of the note, since, if the note be not taken in payment, but merely as collateral and further security for the debt, there would seem to be no propriety, as against other claims upon the vessel, in allowing the secured claimant to share in the proceeds upon surrender of his additional security, because such surrender can in no way benefit the other claimants upon the proceeds, and operates only to release the additional debtor. It would, we think, be more equitable to require such secured creditor first to pursue and exhaust his collateral security. However that may be, we think the rule declared should be qualified in this, that the time of payment granted by the note should not extend the term of payment of the debt beyond the period within which by the law the lien should be prosecuted; for, if the lienor may be indulged in granting such time of payment as he may elect, he would thereby be permitted to retain a dormant lien upon the vessel, to the injury of the subsequent lienors, and to the sustaining of stale demands. If, therefore, time of payment be granted beyond the time declared by statute or general law for the assertion of the lien, the lienor has disqualified himself to prosecute the lien within the permitted time, and it is gone. Peyroux v. Howard, 7 Pet. 324; The Highlander, 4 Blatchf. 55, Fed. Cas. No. 6,475; Green v. Fox, 7 Allen, 85; Bailey v. Hull, 11 Wis. 289; Schmidt v. Gilson, 14 Wis. 514; Dey v. Anderson, 39 N. J. Law, 199.

It has also been held that the mere taking of a mortgage upon the res, to secure the note given for the claim, may not be, of itself, a waiver of the claim. The D. B. Steelman, 48 Fed. 580. It may seem somewhat inconsistent to accept a subordinate for a superior lien, retaining at the same time a claim for the superior. In Kornegay v. Styron, 105 N. C. 14, 11 S. E. 153, it was held that the taking of the mortgage was a waiver of the lien, and estopped the lienor to assert the lien. We need not here determine the question. It is sufficient to say that in The D. B. Steelman, supra, Judge Hughes, reviewing the decisions in The Ann C. Pratt, 1 Curt. 340, Fed. Cas. No. 409, Stapp v. The Swallow, 1 Bond, 189, Fed. Cas. No. 13,305, and Dudley v. The Superior, 1 Newb. 176, Fed. Cas. No. 4,115, distinguished the case then in hand from those, pointing out the fact that there the claimant had taken notes for the amount of his lien, extending the time of payment for a period not exceeding four months, and a mortgage upon an undivided one-half interest in the vessel, and observes:

"If, however, the taking of the mortgage be attended by acts inconsistent with the lien, or prejudicial to other maritime creditors (for instance, if the credit given by it be so long as to make the claim it is intended to secure stale, in the sense of the maritime law), or if the execution of the mortgage be in manner such as to make it conflict with the rights of maritime creditors whose claims are of equal dignity with that secured by the mortgage, then it

would be inequitable to allow to the mortgagee the benefit of two remedies against the ship, and his taking the mortgage would be held as waiving the maritime lien."

And he further observes, with respect to the case there involved, that:

"It is not the case of a voluntary abandonment of the remedy in admiralty for a resort to the inconsistent and different remedy of attachment and personal judgment in a state court. Nor, in this case, has there been a sleeping by the claimant upon his mortgage so long as to allow his claim to grow stale, to the prejudice of the rights of maritime lien creditors whose claims are fresh."

The period within which a maritime lien should be enforced has not been determined with precise definiteness. The subject has, however, frequently been under deliberation, and the considerations which should induce to a short period of limitation have been strongly presented. A longer period is allowed as against the owner of the vessel than as against a subsequent innocent purchaser or subsequent innocent lienor. With respect to vessels navigating the high seas, from an early time the limit has been by the voyage. The Charles Carter, 4 Cranch, 332. And liens for wages, supplies, and bottomry arising upon a subsequent voyage are given priority to those arising upon a previous voyage, unless peculiar circumstances should demand equality in their payment. The Paragon, 1 Ware, 331, Fed. Cas. No. 10,708; Porter v. The Sea Witch, 3 Woods, 75, Fed. Cas. No. 11,289. But with respect to lake and harbor navigation a different rule has prevailed. Upon the Great Lakes the time has been limited by the seasons of navigation, and not by the voyage, and claims of equal rank arising during each season are paid pro rata, without respect to the particular voyage. In the open harbors, where there is no close of the season of navigation, a limit of 40 days has been determined. Stillman v. The Buckeye State, Newb. 111, Fed. Cas. No. 13,445; The Detroit, 1 Brown, Adm. 141, Fed. Cas. No. 3,832: The Hercules, 1 Brown, Adm. 560, Fed. Cas. No. 6,400; The Dubuque, 2 Abb. (U. S.) 20, 32, Fed. Cas. No. 4,110; The Delos De Wolf, 3 Fed. 236, 239; The J. W. Tucker, 20 Fed. 129, 134; The Proceeds of The Gratitude, 42 Fed. 299; The Samuel Morris, 63 Fed. 736.

The rule with respect to the Great Lakes and harbors is a modification of the general maritime law, which adjusted liens by the voyage. The rule is somewhat arbitrary, as would be any rule that was a departure from the rule of the general maritime law. It was, however, rendered necessary in the interest and for the protection of maritime liens, and because of the shorter voyages upon the lakes; and the rule as applied to the Great Lakes commends itself to our judgment as wise and proper. In these days of swift and easy communication by telegraph and telephone between all ports of our country, the reasons upon which maritime claims are upheld have lost somewhat of their cogency, and while it is not within our province to disturb the settled law of the admiralty, as held in this country, we think we should be doing violence to the spirit of the law and the genius of the times by extending, instead of restricting, the period within which secret liens upon vessels may be asserted.

Coming now to the consideration of the facts in this case, and judging them in the light and spirit of the principles which have been stated, we observe that from the first the appellant distrusted the responsibility of Comings, and insisted that for the repairs and alterations which should be made the appellant should have a lien upon the vessel. We need not stop to consider the nature of the lien that was in the contemplation of the parties, for we proceed upon the assumption that it was a maritime lien that was contemplated. It is also manifest that the appellant did not propose to allow the vessel to get beyond the reach of process from the courts of the district within which repairs were made. The repairs were completed on the 21st day of July, 1892. On the 27th of July the appellant exhibited a libel against the vessel under which she was arrested and held in the custody of the marshal until the 20th day of August. Up to this time there was exhibited upon the part of the libelant a determined, energetic prosecution of its claim. At this date the mortgagees appeared upon the scene, and an arrangement was arrived at, in effect that Comings, the owner, should, and he did, execute a bill of sale of the vessel to the mortgagees, and that the mortgagees should, and they did, execute their notes to the appellant for the amount of their claim, secured by mortgage upon the vessel. There was also an agreement between Comings and the mortgagees by which the vessel should be operated by Comings in connection with the Columbian Exposition, so long as it should prove profitable, but that the financial affairs of the vessel should be conducted by the original mortgagees, now owners of the boat, and that the net proceeds of operation should be paid over to a trustee for the payment of the note given by Hume, Galvin & Tyler to the appellant. It is in dispute whether the appellant was informed of the agreement between Hume, Galvin & Tyler and Comings. It does not appear, however, that the appellant knew that Galvin or Tyler were to give their personal attention to the management of the boat and its finances. Upon the consummation of the agreement the appellant voluntarily dismissed the libel which it had exhibited, and consented to the release of the vessel by the marshal, and its surrender to Hume, Galvin & Tyler. The notes which the appellant accepted extended payment of the debt,—a portion until July 1, 1893, a portion until September 1, 1893, and another portion until December 1, 1893. We have thus the case where one, having a maritime lien for the enforcement of which he had invoked the power of a court of admiralty, caused the vessel to be taken and held in custody, and then voluntarily surrendered his position and the custody of the vessel which the court had taken, and permitted its surrender to the original mortgagees, accepted their notes in payment of the debt, extended payment for a period of about 15 months, on the average, and placed himself in such position that he could not assert his lien, if he had one, until the close of the second season of navigation after the work was done. We think that, under such circumstances, the appellant ought not to be permitted to assert its claim against subsequent innocent lienors. We do not think it our duty in the interest of commerce thus to foster the maintenance of secret liens.

We do not think it right, when one has thus invoked the power of the court to enforce an asserted right, and had voluntarily abandoned the proceeding, accepting the obligation of third parties for the debt,—parties who are not satisfactorily shown by any means to be unable to meet their obligation in whole or in part,—that he should be allowed to be reinstated in his original right, to the detriment of those who have subsequently and innocently furnished supplies for the operation of the vessel, contemplated and made possible by his action. The case is somewhat analogous to the case of a vessel libeled, and released upon stipulation to pay the debt. In such case, as against subsequent parties, courts remand the claimant to his remedy upon the stipulation.

We have not failed to consider that by the notes received it was stipulated that their acceptance should not be construed as a waiver of the appellant's lien upon the vessel, but we do not think that that stipulation should be permitted to avail as against subsequent innocent purchasers or lienors, however valid and effectual it might be as against the owner and mortgagees of the vessel. The appellant certainly held itself out to the world as abandoning its lien, and the assertion of it in the courts of admiralty, and as willing to accept for the debt the notes of Hume, Galvin & Tyler, with their mortgage upon the vessel as security. This mortgage was silent as to the stipulation for retention of the lien. It gave no notice of it, and its existence was hidden in the breasts of the contracting parties. It cannot be permitted that one may thus play fast and loose with the rights which the law accords him. It cannot be allowed that a lienor, under the circumstances here disclosed, may surrender the possession of the vessel, accept a mortgage upon it for his claim, and the notes of third persons extending the time of payment beyond the period which the law permits for the enforcement of the right, and still retain his lien. To uphold such conduct would, in our judgment, work great injustice, and prove most injurious to commerce.

The decree will be affirmed.