## THE SAMUEL LITTLE.

### (Circuit Court of Appeals, Second Circuit. February 9, 1915.)

### No. 127.

**1.** SEAMEN ⊙=27—LIEN FOR WAGES—PRIORITY.

A seaman's claim for wages is, because of the peculiar and perilous service in which they are earned, favored by the law, and as a general rule preferred to other liens.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 4, 141, 157–169; Dec. Dig. ⊙=27.]

**2.** MARITIME LIENS ⊙=37—PRIORITY—"FORTY-DAY HARBOR RULE."

The "forty-day harbor rule," whereby, in the case of vessels or tugs engaged in harbor navigation, a period of 40 days, rather than a voyage, or a season, is adopted as the period during which general maritime liens retain their priority, is equitable and proper, and should not be abandoned.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 58–70; Dec. Dig. ⊙=37.]

**3.** ADMIRALTY ⊙=61—PLEADING—ADMISSIONS BY FAILURE TO ANSWER.

Where a party, having a claim against a tug for coal supplied to it, was permitted to answer a libel for repairs, though by its failure to also answer an intervening petition, setting up claims for wages, it conceded the correctness of the allegations of such petition and the liens which it asserted, where the petition contained no allegations as to the priority of such liens, its failure to answer did not preclude it from contesting the petitioners' claim of priority, and the rank and priority of the liens was for the court to determine after they were established.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 497–506; Dec. Dig. ⊙=61.]

**4.** ADMIRALTY ⊙=105—APPEALS—QUESTIONS NOT RAISED BELOW.

In an admiralty proceeding, the objection that a party, by failing to answer intervening petitions setting up claims for wages, conceded the right of such claims to priority, should have been made in the trial court, and could not be considered for the first time on appeal.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 720; Dec. Dig. ⊙=105.]

**5.** MARITIME LIENS ⊙=69—SALE—DISPOSITION OF PROCEEDS—PRIORITIES.

A "maritime lien" is not a mere matter of procedure, but a right of property, or a proprietary interest in the boat or vessel; and hence the proceeds of a sale are to be distributed according to the rightful priorities of the liens themselves, without reference to the priority of the proceedings to enforce them, and the party whose lien is first filed acquires no superior rights thereby.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 107; Dec. Dig. ⊙=69.

For other definitions, see Words and Phrases, First and Second Series, Maritime Lien.]

**6.** ADMIRALTY ⊙=16—MARSHALING ASSETS—FIXING PRIORITIES.

The admiralty courts have authority to marshal assets, and give priority to one class of claims over another, and to require that a claim of priority be asserted within 40 days, or, if not so asserted, to postpone it to a later claim more vigilantly prosecuted.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 23–28, 191–205; Dec. Dig. ⊙=16.]

**7.** SEAMEN ⊙=27—WAGES—PRIORITIES—LACHES.

While the holder of a claim against a vessel for wages may lose his right to priority of payment over a claim of inferior rank by laches, prior-

---

⊙=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ity cannot be denied on the sole ground that the inferior claim accrued within 40 days preceding the filing of the libel, and that the claim for wages did not.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 4, 141, 157–169; Dec. Dig. ☞27.]

**8. SEAMEN ☞27—PROCEEDINGS TO ENFORCE CLAIM—PLEADING—LACHES.**

In a proceeding on a libel against a vessel, the staleness of a claim for wages earned several months before the filing of the libel did not defeat the right of such claim to priority over a claim for supplies, where such staleness was not pleaded, since laches as a general rule must be pleaded, and, though it need not be, if it is plainly apparent, on the complainant's own showing, that he has slept too long on his rights, a delay of a few months in asserting a seaman's claim for wages was not such apparent or gross laches as made the general rule inapplicable.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 4, 141, 157–169; Dec. Dig. ☞27.]

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here on appeal from a final decree entered in the District Court of the United States for the Eastern District of New York, on March 9, 1914, awarding priority to wage claims over a supply claim which accrued subsequently. Affirmed.

The Samuel Little is a harbor tug employed in and about the harbor of the city of New York. The tug was sold by the United States marshal on February 14, 1913, under a libel for repairs. The sum realized has not been sufficient to pay all filed claims, and it is necessary to adjust priorities between them.

Claims were filed subsequent to the filing of the libel by several members of the crew of the tug for wages, and by William Horre & Co., whose claim is for coal supplied to the tug. It was contended by appellant that what has been known as the "forty-day rule" should determine the priority of payment, and that wage claims, though retaining priority for a period of 40 days, were subordinate to claims accruing during a subsequent period of 40 days.

The District Judge declined to apply the 40-day harbor rule to wage claims, and held that all such claims, irrespective of the time of accrual, should be accorded a preference over the claim of William Horre & Co. for coal supplied to the tug within 40 days previous to the first attachment of the vessel—on January 30, 1913. The coal had been delivered at various times between January 1 and 25, 1913, and the claim of John J. McCambridge for wages arose in June and July, 1912. The appeal is from so much of the decree as prefers the wage claims over the claim of the appellant for supplies.

Alexander & Ash, of New York City (Mark Ash and William Ash, both of New York City, of counsel), for appellant.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This appeal raises for the first time in this court the question whether what is known as "the forty-day harbor rule" is to be upheld and applied to the wages of men employed on tugs in and about the harbor of New York. The amount involved is small, but the principle involved is one of considerable importance. All the wage claims, with the exception of the claim of John J. McCam-

bridge, are within the 40-day rule. McCambridge was employed on the tug as a deck hand at $30 a month, and his claim amounted to $60, and was for wages due during the months of June and July, 1912. His petition as originally filed alleged that he was employed on the tug from September 1, 1912 to October 30, 1912. But his testimony at the trial showed this to be error, and he was allowed to amend his petition to conform with the proof. His employment ended, therefore, 6 months prior to the filing of the libel, and yet his claim for wages was given priority by the court below over the claim for coal which had been supplied to the tug within 40 days prior to the attachment.

[1] A seaman has long been regarded as a ward of the admiralty, and his claim for wages has been called many times a "sacred claim." He has been allowed to enforce it either by suit against (1) the owners of the vessel, or (2) against the master personally, or (3) by process against the ship in a court of admiralty jurisdiction for the enforcement of the lien given him by the maritime law. Maclachlan's Law of Merchant Shipping, p. 258 (5th Ed. London 1911). In the Laws of England, vol. 26, p. 264 (1914), the law is stated as follows:

"The seamen's lien for wages takes priority over the master's lien for wages and disbursements, to a bottomry bond whenever given, to the claim of a mortgagee, to towage and light dues, and to a shipwreck's possessory lien, to the extent of the wages earned up to the time the vessel is put into the hands of the shipwright. The seamen's lien is postponed to a damage lien, to salvage rendered after the wages earned, to a shipwright's lien from the time he had possession, and to dock dues."

In American and English Encyclopedia of Law (2d Ed.) vol. 19, p. 1121, it is said:

"The lien for seamen's wages is the most tenderly guarded of all liens by the courts. As a general rule it is preferred to all liens incurred during the voyage, except for salvage."

And in Abbott's Law of Merchant Ships and Seamen, p. 1025 (14th Ed. 1901), the law is stated as follows:

"The lien for seamen's wages, including in certain cases subsistence money and viaticum, takes priority over the master's lien for wages and disbursements. It also has priority over a bottomry bond, and it matters not whether the wages were earned before or after the bond was given. It also ranks before the lien for necessaries, the shipwright's possessory lien, when the wages were earned before the repairs were taken in hand, and payments made for towage and light dues."

The doctrine of priority of seamen's wages is established beyond question. The William F. Safford, Lushington, 69 (1860); The Union, Lushington, 128 (1860); The Salacia, Lushington, 545 (1862); The Great Eastern Steamship Co., 6 Aspinall's M. C. (N. S.) 511, 515 (1885); The Andalina, 6 Aspinall's M. C. (N. S.) 62 (1886); The Tergeste, 9 Aspinall's M. C. 356 (1902). In The Madonna D'Idra, 1 Dodson, 37 (1811), Sir William Scott, speaking of mariner's wages, says:

"These are sacred liens, and as long as a plank remains the sailor is entitled, against all other persons, to the proceeds, as a security for his wages."

The wages of seamen have been favored in the law of all nations because of the peculiar and perilous service in which they are earned.

The reason for doing so appears in the statement made in Benedict's Admiralty, § 190:

"Ships were originally invented for use and profit, to plough the seas, not to lie by the walls.' The ship being finished and furnished, her first want is a ship's company to navigate her. Without their strength, and knowledge, and skill, and intrepidity, she must rot at the wharf, or be hurried to destruction. The ship, that by the agency of the most uncertain, capricious, and powerful elements moves with a certainty and a security only surpassed by the beauty of her appearance and the grace of her motion, when under the control of a well-appointed crew, becomes, in the hands of unpracticed landsmen, the victim of the first peril, and their efforts only urge her the sooner to inevitable destruction. The service of the ship's company is, therefore, the maritime service which is entitled to the highest consideration and the greatest favor; and the jurisdiction of the admiralty in cases of mariners' wages is settled by a course of decisions of unbroken authority during centuries. The jurisdiction over such cases is firmly established in this country on principle, and all cases of mariners' wages are, par excellence, maritime cases, and subject to the jurisdiction of the admiralty; and this includes whaling, sealing, and fishing voyages, and demands for subsistence, expenses of cure, etc., which are in the nature of wages. The master alone may not in this country libel the ship for his wages; it being held that he looks to the owners, and not to the ship, for his security. The rule is different in England, and therefore the English law is applied by comity, and the master of an English vessel may libel her in our courts for his wages."

The United States has legislated upon the subject in much detail. See Revised Statutes (2d Ed. 1878) §§ 4524–4548. It has even been provided that:

"Sec. 4535. No seaman shall, by any agreement other than is provided by this title, forfeit his lien upon the ship, or be deprived of any remedy for the recovery of his wages to which he would otherwise have been entitled; and every stipulation in any agreement inconsistent with any provision of this title, and every stipulation by which any seaman consents to abandon his right to his wages in the case of the loss of the ship, or to abandon any right which he may have or obtain in the nature of salvage, shall be wholly inoperative."

Great Britain has with equal care legislated in detail for the protection of the rights of seamen in respect of wages. See Merchant Shipping Act 1894, § 155 et seq.

[2] Under the general maritime law the rule was established at an early day that services, supplies, and repairs incurred on a subsequent voyage outranked those incurred on a prior voyage; the vessel being employed in the navigation of the seas. The liens connected with every new voyage were accorded priority over all former ones after the vessel had sailed, if there had been reasonable opportunity for the enforcement of the earlier ones prior to the second sailing. See Jones on Liens, § 1801 (3d Ed. 1914); The Charles Carter, 4 Cranch, 328, 332, 2 L. Ed. 636 (1808).

The application of the voyage rule to vessels employed simply upon the inland waters of this country unduly limited the period of credit. The courts therefore modified the rule with respect to vessels employed upon the Great Lakes and inland waters, and the principle was established that claims for repairs, supplies, and other maritime services rendered to such vessels in one season should outrank claims for repairs, supplies, and maritime services rendered during the preceding season, without regard to the particular voyage in which they were in-

curred. The season of open navigation of such waters, and not the particular voyage, was made the rule by which the priority of the payment of the claims against the vessels were to be determined. The question arose in 1856 in the District Court of Michigan in The Buckeye State, Newb. 111, 114, Fed. Cas. No. 13,445, and Judge Wilkins said: ·

"Especially in the navigation of these Northwestern lakes, where several voyages are made during the season, from port to port, traversing every two weeks from one extreme point to the other, there is great reason to limit these tacit liens to the season of navigation, and not extend their obligation beyond a year."

And see The Dubuque, 2 Abb. U. S. 20, 32, Fed. Cas. No. 4,110 (1870); The Detroit, 1 Brown, Adm. 141, 147, Fed. Cas. No. 3,832 (1874); The Hercules, 1 Brown, Adm. 560, 563 (1875); The City of Tawas (D. C.) 3 Fed. 170 (1880); The Athenian (D. C.) 3 Fed. 248 (1877); The Nebraska, 69 Fed. 1009, 1014, 17 C. C. A. 94 (1895). In The J. W. Tucker, 20 Fed. 129, 134 (1884), Judge Addison Brown, in a case in the Southern district of New York, thought the season rule should be applied to the case of a canal boat on the Connecticut river. After calling attention to the rule which had been adopted as respects vessels navigating the Western lakes and rivers, of making the division of claims by the successive open season of navigation, instead of by the separate voyages during each season, he said:

"The season of navigation is regarded as in the nature of a single voyage, and the rules applicable to a single ocean voyage are applied, as regards liens for supplies, to the navigation of a whole season."

And then he stated that he thought the same rule should be applied—

"in the case of canal boats and other similar craft which make short and frequent trips upon the canals and rivers, and are laid up during the winter season, when the canals and rivers are frozen over. The same consideration of convenience, justice, and policy apply to this class of cases as in navigation upon the Great Lakes. They cannot be applied, however, to other craft navigating about this port, making short ocean voyages, without interruption, the year round."

While the application of the voyage rule to ships navigating the inland waters unduly limited a vessel's credit, the application of the season rule to vessels or tugs engaged in harbor navigation unduly extended credit. It came to pass, therefore, that the rule again underwent modification, and the 40-day rule was formulated and applied to tug and ferry boats engaged in harbor navigation. The boats make daily voyages and are amenable to process practically all the time. The 40-day rule was laid down for the first time in 1890 by Judge Addison Brown in the District Court for the Southern District of New York in The Gratitude, 42 Fed. 299. In that case 10 libels had been filed against the tug. Two of them were for wages; the rest were for materials, repairs, and labor. More than two-thirds of the amounts of the items were over a year old. Judge Brown called attention to the fact that the general maritime law adjusted all liens by the voyage, and that the priority of the liens continued only till the next voyage and to the season rule applied on the Great Lakes, and which had been adopted in cases arising as to tugs in New York Harbor, and then stated that the

time allowed for retaining priority in these harbor cases should be reduced to 40 days.

"If the general maritime rule, however, were applied literally," he said, "to the daily or hourly trips of harbor tugs, treating such trips as voyages, liens on them would be practically disallowed altogether, since business could not be carried on with daily libels."

The voyage rule applied to ocean steamers and the season rule applied to vessels on the Great Lakes could not properly be applied to harbor tugs, and the 40-day rule was accordingly adopted, upon the theory that it would give the short credit incident to the usual rendering of monthly bills and 10 days more for settlement, or libeling the boat in case of nonpayment.

The 40-day rule was followed in 1894 in the Eastern district of New York by Judge Benedict, an accomplished admiralty judge, in The Samuel Morris, 63 Fed. 736. It does not appear what the claims were for, whether for wages or for supplies. Judge Benedict simply declared:

"The rule laid down in the case of The Gratitude seems to be a very proper rule, and I see no reason why it should not be applied in a case like this."

The question was before the same judge again in 1896 in The Glen Iris (D. C.) 78 Fed. 511. In that case the wage claims had all been paid. The dispute was over claims for repairs, supplies, wharfage, and damages for collision. The 40-day rule was applied. The question came up in the Southern district of New York in 1912 in The Glen Island, 194 Fed. 744. In that case wages were not involved, but the dispute related to liens for supplies and repairs, and the 40-day rule was applied; Judge Hough in his opinion saying:

"It remains to inquire whether any reason exists for disturbing the rule of The Gratitude, supra. This is mentioned because it was said at bar that not much has been heard of that rule in recent years, and its abandonment was suggested. No reason for such change is seen. It is just as true now as when The Gratitude was decided that in the interest of lienors generally some limit must be set measuring out periods of time within which claims of the same rank shall share pro rata, and the measure fixed by Brown, J., has in my judgment, been justified by experience."

The 40-day rule was adhered to without dissent in both the Southern and Eastern districts of New York until 1914. In that year the question came before Judge Chatfield in the Eastern district in The Towanda, 215 Fed. 232, and he held that the 40-day rule did not apply to claims for wages for services rendered in the case of harbor tugs, but that such claims were entitled to priority for a reasonable time. After citing the act of Congress of June 23, 1910 (36 Stat. 604, c. 373), and stating that by it a maritime lien is given for repairs, supplies, and other necessaries, to a foreign or domestic vessel, he stated that the act contained no provision with respect to seamen's wages, and that such wages were entitled to a preference as before the enactment. Then he added:

"Under the United States statute just cited, no period is stated within which the lien must be prosecuted, and hence a reasonable time would seem to be the only limit which can be imposed; that is, laches in bringing a claim should be held to be a defense."

A few months later in a suit against the same steam lighter the same judge seems to have adopted the 90-day rule by analogy to the New York statute.

"It would seem," he declares, "that in this case all claims accruing within 90 days before the attachment should be paid pro rata, after payment of costs of the action in which the boat was sold." The Towanda (D. C.) 216 Fed. 270.

The reasons by which the District Judge was led to his abandonment of the 40-day rule are to be found in the following excerpt from his opinion:

"It is urged that no materialman would wish, as a matter of business, to file a libel and attach a vessel which was continuing to obtain supplies, unless some other claimant found it necessary to begin action. It would also appear that great discrepancies would result in case the 40 days did not correspond to the exact 30 days and 10 days' grace with respect to each of the claims affected. No two claims would become due at the end of the same 40 days. The rule seems to have been disregarded and considered a dead letter for a long time. The principle has rather been applied of considering each case from the standpoint of due diligence; but in no case has more than one voyage or one season been considered a 'reasonable period.' In most cases, claims of the same rank and of approximately the same period have been prorated, and this would seem to be fairer than to establish a fixed period within which to order payment in inverse order. Each case, where agreement cannot be reached, must be considered by itself."

The question arose a third time in the Eastern district in the same year, coming before Judge Veeder in the case at bar, and he refused to apply the 40-day rule to the wage claims and contented himself with the filing of a memorandum in which he simply states:

"In the absence of authority I am not disposed to apply the 40-day harbor rule to these wage claims."

It thus appears that the 40-day rule has been steadily adhered to in the Southern district of New York for nearly a quarter of a century, but that recently in the Eastern district it has been rejected in its entirety in favor of a theory of a reasonable time or possibly of a 90-day rule. That a conflict of opinion should exist on this subject in the two districts, separated from each other by the East River and having concurrent jurisdiction over New York Harbor, is certainly unfortunate. Harbor liens in the harbor of New York clearly should not be determined upon one principle in the Southern district and by another in the Eastern district. This case has been brought to this court, that a uniform rule may be established and an end put to the doubt which now exists in this circuit as to what the law on this subject is.

We are thus brought to inquire whether the 40-day rule as laid down by Judge Brown in The Gratitude, supra, is to be adhered to, or whether circumstances have so changed as to make the rule which was equitable and proper when adopted inequitable at the present time. It is our opinion that there has been no such change of conditions here as to justify a departure from the rule. The equity of the rule seems to have been accepted and conceded by all up to the present time, as is shown by the fact that the matter has never before reached this court. The rule, as we have seen, was established in the first instance because

the longer extension of time which had been given to these liens had led to evils and abuses of so serious a nature that the court deemed itself justified in correcting them by shortening the time to 40 days. The change in the rule worked well, and corrected the evils incident to the former rule, and worked no prejudice to the vessels. We have lookd in vain into conditions as now existing to discover what reasons there are for now departing from a principle which has so long been accepted without question, and which was originally laid down by a judge whose great knowledge of admiralty law has been for many years widely recognized, and whose wisdom concerning matters relating to maritime affairs has been conceded by all. It is as true to-day as it was when the 40-day rule was established that a longer extension of credit to the vessel would lead to abuses and evils, without any corresponding advantage to the vessels. Secret liens do not deserve encouragement. They should retain their priority for a short period of time. The reasons for a longer period, instead of becoming more cogent, have steadily become less cogent. If the 40-day rule is to be changed at all, it should be by shortening it rather than by extending it.

It may be conceded that in some cases the rule may work a hardship in special cases. But that may be said of most rules, and perhaps of all rules. The advantage, however, of knowing in advance the exact period within which a lien can retain its priority more than compensates for any hardship which occasionally is suffered in an isolated case. It may be said that the 40-day rule simply fixed an arbitrary period. That may be true. But the same thing may be said with equal truth of the voyage rule and of the season rule. Any period of time that may be fixed upon is necessarily an arbitrary period.

This brings us to inquire whether under the 40-day harbor rule the preferred lien of seamen's wages earned during an earlier period of 40 days should be postponed to a maritime lien for supplies which is later in time.

[3, 4] The libel was filed by Arthur F. Smith on January 30, 1913, and on this libel the vessel was attached. Smith was the captain of the steam tug. His claim has been disposed of, and no appeal is taken in regard to it. A petition on January 30, 1913, setting forth their claims, was filed on behalf of John Ware and Harry Plate, members of the crew, who asked permission to intervene. On February 13, 1913, John J. McCambridge and Clarence W. Taft filed a petition as members of the crew, and asked to intervene. Subsequently the petition on behalf of Taft was discontinued, so that the Taft claim is not before the court. On March 11, 1913, the appellant, William Horre & Co., as an intervening libelant, made a motion for leave to file an answer to the libel of said Smith, which motion was granted, and thereafter, and on October 21, 1913, an answer was filed by William Horre & Co. In said motion the appellant asked for permission to answer the libel of Smith, and there was no other party's claim set forth in said libel, except Smith's. No answer was ever made to, nor was permission sought to answer, the petitions of the interveners. The appellees insist, therefore, that the appellant is in default for want of an answer

to said petitions, and thus, by such default, conceded the correctness of the allegations set forth in the petitions, and is not in any position now to contest said liens.

It may be conceded that the failure of the appellant to answer the petition of the interveners concedes the correctness of the allegations which they contain and the liens which they assert. But this does not preclude appellant from raising the question as to the priority of liens, for the petitions of the interveners make no allegations concerning that matter. The rank and priority of the liens is for the court to determine after the liens are established, and upon that question both appellant and appellee have a right to be heard. The objection made is without merit, and, if there had been merit in it, the place to have raised it in the first instance was in the court below; and, not having been made in that court, it is not entitled to be considered for the first time in this court. See The Flottbek, 118 Fed. 954, 958, 55 C. C. A. 448.

[5] The courts at one time held that, as between maritime liens of the same rank, priority was to be given to that on which the libel was first filed and the vessel first arrested, without regard to the dates when the liens respectively accrued. See The Triumph, 2 Blatchf. 433, note, Fed. Cas. No. 14,182 (1841); The Globe, 2 Blatchf. 433, Fed. Cas. No. 5,483 (1852). These cases proceeded upon the theory that a maritime lien was in reality only a privilege to arrest the vessel for a debt which of itself constituted no incumbrance on the vessel, and became such only by virtue of an actual attachment. But this theory was abandoned long ago, and the principle became recognized that a maritime lien is not a mere matter of procedure but a right of property. It is a jus in re, a proprietary interest in the boat or vessel, which may be enforced directly against the thing itself by a libel in rem, in whosoever possession it may be. See Yankee Blade, 19 How. 82, 89, 15 L. Ed. 554 (1856); The Lottawanna, 21 Wall. 579, 22 L. Ed. 654 (1874); Coffin v. Shaw, 3 Ware, 82, Fed. Cas. No. 2,952 (1856); The Young Mechanic, 2 Curtis, 404, Fed. Cas. No. 18,180 (1855).

Viewing maritime liens, therefore, as a proprietary interest in the vessel itself, and the filing of the libel and seizure of the vessel as proceedings merely to enforce a right already vested, the courts have held that, as between different lienors of the same class, any proceeds in the registry are to be distributed according to the rightful priorities of the liens themselves, without reference to priority of proceedings merely to enforce them. The J. W. Tucker (D. C.) 20 Fed. 129 (1884).

But the case at bar is not determined by the principle above stated. The question here is whether a claim of the first class is to be postponed to a claim of the second class when the claim of the first class was incurred in an earlier 40-day period than that in which the claim of the second class was incurred.

[6] The appellee contends that the court has no inherent power to establish a rule fixing the period of time a lien shall retain its preference or priority. That the court has a right to regulate its practice and procedure under section 918 of the Revised Statutes (Comp. St. 1913, § 1544) is conceded, but it is said that a rule which fixes and determines the duration of a lien or the priority of a lien is a rule of prop-

erty, and not one of practice or procedure, and therefore beyond the potency of the judicial power. Under this theory the equity courts of the United States would be deprived of the right which courts of equity have exercised from the beginning of marshaling assets. The courts have held that the statutes of limitation do not apply to claims for seamen's wages. The statute of Anne (4 Anne, c. 16, § 17) provided:

"That all suits and actions in the court of admiralty for seamen's wages shall be commenced and sued within six years next after the cause of such suits or actions shall accrue."

The question came before Mr. Justice Story in 1822 in Willard v. Dorr, 3 Mason, 91, Fed. Cas. No. 17,679, whether this statute applied to the courts of the United States, and he decided that it did not. His opinion was that it applied only to the High Court of Admiralty in England, that there was no reason to suppose Parliament meant to include the colonial courts, that the statute of Anne was never adopted in practice in any of the colonies as a rule governing their courts of admiralty, and that, if it had been adopted in practice by the colonial courts before the Revolution, it did not follow that it was obligatory upon the admiralty courts of the Union, which derived their powers and authority from the Constitution and laws of the United States and had no connection or dependence upon the colonial Vice Admiralty Courts.

"Undoubtedly," he said, "courts of admiralty, like courts of equity, will not entertain stale demands, and will assume, upon general principles, some limitation. It will presume demands extinguished after the lapse of a reasonable time, and feel that it best dispenses justice by refusing its aid in reviving dormant and antiquated claims. This, however, is the exercise of a far different power from that of entertaining a strict legal bar. It is an exercise of sound discretion, and it is to be guarded by a wholesome equity."

Prior to that decision, however, and in 1815, the question whether a state statute of limitations was a bar to a libel of a seaman for wages in an admiralty court of the United States had been before the same judge in Brown v. Jones, 2 Gall. 477, Fed. Cas. No. 2,017. It was argued that the claim which accrued more than six years before the commencement of the suit was barred by the statute of limitations of Massachusetts, which was substantially a copy of the statute of 21 Jac. c. 16. But it was held that the Massachusetts statute applied only to suits at common law for mariners' wages, and not to suits in the admiralty, and that the statute of 21 Jac. did not apply to suits in the admiralty. The judgment of the District Court decreeing wages was affirmed, notwithstanding the fact that the wages were earned more than six years before. There is no act of Congress limiting the period within which such actions can be brought, nor specifying the period within which the lien continues.

In the Supreme Court of the United States, in The Key City (1871) 14 Wall. 653, 660 (20 L. Ed. 896), the principle that statutes of limitation do not apply in such cases is announced, and the following rules are laid down:

"1. That, while the courts of admiralty are not governed in such cases by any statute of limitation, they adopt the principle that laches or delay in the

judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defense.

"2. That no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case.

"3. That where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defense will be held valid under shorter time and a more rigid scrutiny of the circumstances of the delay than when the claimant is the owner at the time the lien accrued."

The contention that the admiralty courts of the United States are without authority to marshal the assets and give priority to one class of claims over another is a startling proposition. It is without merit. But in the argument before this court counsel do not deny the authority of the court to state whether or not a claim is stale, but they assert that it is beyond the power of the court to lay down a rule that all claims are stale unless prosecuted within 40 days after the debt becomes due. The court in establishing the 40-day rule does not, however, undertake to enact a statute of limitations. The rule simply requires that, if a preference is to be asserted, it should be done within the designated period, or it may be postponed to a later claim which is more vigilantly prosecuted. That the court has the right to do this surely cannot be seriously controverted.

The question of precedence of liens is one that it was said in The Union, Lushington, 128, 137 (1860), should be determined by the lex fori. But in this country, by comity, the law of the country to which a foreign vessel belongs is observed in enforcing liens against a foreign vessel. Jones on Liens, § 1791 (Edition of 1914).

In laying down the 40-day rule in The Gratitude, supra, the learned District Judge said:

"In the above cases there will be paid: (1) Seamen's wages; next (2) supply liens arising within 40 days before August 28, 1889, on which day the towage lien for damage accrued; next (3) the lien for damage in towing; next (4) the residue to be divided pro rata among the remaining claims for supplies. The costs are allowed with the claims."

Because the District Judge expressly limits the supply liens to those arising within 40 days, without expressly placing a like limitation upon the wages, it is suggested that the 40-day rule was not intended to be applied to wages. We are not able to accept that view. We find no authority for any such distinction as to seamen's wages, and no reason why such distinction should be made. In determining such a question, the same rules apply to liens for wages as to liens for repairs and supplies. In The Dubuque, 2 Abb. U. S. 20, Fed. Cas. No. 4,110, the court in discussing the subject of laches says:

"In determining this question, the same rules apply to liens for wages as to liens for repairs and supplies."

And in The Nebraska, 69 Fed. 1009, 17 C. C. A. 94 (1895), the court says:

"And liens for wages, supplies, and bottomry bonds arising upon a subsequent voyage are given priority to those arising upon a previous voyage, unless peculiar circumstances should demand equality in their payment."

In The Harriet Ann, 6 Biss. 13, Fed. Cas. No. 6,101 (1874), it was held that a claim for seamen's wages became stale, as against a bona fide purchaser for value, if not prosecuted during the season after which the claim accrued. And see The Live Oak (D. C.) 30 Fed. 78 (1887). There certainly can be no reason for according to wages of seamen employed on harbor tugs a privilege beyond that accorded to seamen on vessels on the sea or on the Great Lakes. If the claims for wages in the case of The Gratitude were all within the 40-day period, and the claims for supplies were in part within and in part without the period, as we assume was so, the language used was such as the circumstances required.

The courts have held that wages earned and supplies furnished for a subsequent voyage are entitled to priority of payment over wages and supplies furnished for an earlier voyage. See Porter v. The Sea Witch, 3 Woods, 75, Fed. Cas. No. 11,289 (1877).

But, conceding that to be established law, as we do, it does not help us to decide the question in this case, whether a claim of a prior class is to be postponed to a claim of a subsequent class when the latter claim has been earned on a later voyage, season, or 40-day period. That question seems involved in much obscurity and is one difficult to answer. In The Panthea, 1 Aspinall's M. C. (N. S.) 133 (1871), attention is called "to the confusion in which the whole question of the priority of liens is involved." The question in that case did not relate to the priority of a subsequent class of claims over a prior class of claims, when the claims were connected with different voyages.

In the present suit the proposition is not disputed that a claim for a seamen's wages earned in a first voyage, or season, or 40-day period, is entitled to priority over a claim for supplies, when both claims arise in connection with the same voyage, or season, or 40-day period, if such a period is to be recognized. But the contention is that if the wages claim arises in the first voyage, or season, or 40-day period, and the claim for supplies originates in a subsequent voyage, or season, or 40-day period, then the claim for wages loses its priority over the claim for supplies.

Upon the precise question involved we find very little in the authorities. In The Union, Lushington, 128 (1860), Dr. Lushington laid down the rule that seamen's wages have precedence over a bottomry bond, whether they were earned before or after the date of the bond. See, also, The William F. Safford, Lushington, 69 (1860). In both The Union and The William F. Safford the wages seem to have been earned on the voyage in the course of which the bond was given. It was thus an established principle in the English maritime law that claims for seamen's wages had priority over a bottomry bond. But it appears that in 1873 Sir R. Phillmore in The Hope, 1 Aspinall's M. C. (N. S.) 563, gave priority to the bottomry bond over the claim of a master for wages in a suit in which the wages were earned on prior voyages to that on which the bottomry bond was given.

At first thought this decision would seem to justify the conclusion that claims belonging to a superior class lose their priority over claims of an inferior class which originate upon a subsequent voyage. But it is not at all clear that any such conclusion can properly be deduced from the decision. The case related, not to seamen's wages, but to the wages of a master, and they are not in the same class, and the editor of the great work of Maclachlan on the Law of Merchant Shipping, p. 260, note (5th Ed. London, 1911), takes the pains to point out that it is doubtful whether the rule adopted in The Hope Case, postponing the master's claim to wages, would be applied to the claim of a seaman. The editor says:

"The decision in The Hope cannot be considered decisive, as different considerations may apply to the question of priority in the case of the master who grants the bond and in the case of the seaman. See The Jonathan Godhue (1858) Swab. 524; The Salacia (1862) Lush. 545."

In the report which the registrar made in The Hope, and which Sir R. Phillmore confirmed, it is said, after a review of the cases:

"But I do not find any case in which it has been held that a master is entitled to priority over a bondholder for wages and disbursements incurred on voyages prior to that in which the bond was given. This being so, I must adhere to the general rule, as stated by Mr. Maclachlan, that liens in the nature of rewards for services rendered rank against the fund in the inverse order of their attachment on the res, and that the last in time should be the earliest in payment. I must therefore hold that, except in respect of the comparatively trifling sum which is due to the master for his services after he had resumed the command of the vessel at Londonderry, the bondholder is entitled to priority."

The decision in The Hope Case does not seem to rest upon any general principle that claims of a superior class arising on a first voyage are to be postponed to claims of an inferior class arising on a second voyage. If it rested on that principle, there could be no doubt but that the decision would be as applicable to seamen as to masters. But it seems rather to rest upon the peculiar nature of a bottomry bond and of the master's rights, which are in some respects different from those of the seamen and inferior thereto.

A question somewhat analogous to that in the pending suit was before the District Court of Michigan in The City of Tawas, supra. That was decided by District Judge Henry B. Brown, later Mr. Justice Brown of the Supreme Court of the United States, and a distinguished authority in maritime law. He, too, alludes to the fact that "the subject of marshaling liens in admiralty is one which unfortunately is left in great obscurity by the authorities." He makes no allusion to the case of The Hope, and, indeed, refers to no authorities upon the exact question under discussion. He says:

"While there are several authorities to the effect that a creditor who obtains a final decree before another creditor, having a co-ordinate or equal claim, has intervened to enforce such claim, is entitled to be paid in preference to him who did not assert his right until after the entry of such decree. See The Saracen, 2 W. Rob. 451; The America, 16 Law Rep. 264. I know of none which gives such preference to a creditor holding a claim of an inferior class, notwithstanding he may have obtained a decree before the filing of other libels of a higher class."

He also says:

"Claims of the same class are sometimes ordered put in the inverse order in which they accrue. This, I believe, is invariably observed in the case of bottomry bonds; the last being put first, and the first last. Maclachlan on Merchant Ship. 652. In some cases it is said that necessaries furnished for the last voyage should be paid in preference to those furnished for a former voyage, and the rule certainly seems a reasonable one as applied to long voyages upon the ocean, but wholly inapplicable to the daily or weekly trips made by vessels upon the Lakes. I regard it, however, as a reasonable modification of the general practice that claims of equal rank should be paid pro rata, that each year should be considered as a voyage, and that claims accruing the last year should be paid in preference to claims of the same rank accruing the year before; each season of navigation here being separated from the preceding season by four months of inaction. This will encourage diligence in the prosecution of claims, and prevent the proceeds of sale from being absorbed by dilatory creditors. But I know of no authority or principle which would justify the court in ordering a claim of an inferior rank to be paid prior to claims of a superior rank, on the ground that the latter claim accrued the year before the former, unless the defense of stale claim is pleaded to the libel. Maclachlan, 652."

[7, 8] The conclusion to which we have arrived after giving the matter careful consideration is that we are not justified upon the authorities or upon principle in holding that a claim of inferior rank is to be paid prior to a claim of a superior rank solely on the ground that the latter claim accrued within 40 days preceding the filing of the libel and the former did not. The holder of a claim of superior rank undoubtedly may lose his right to priority of payment over a claim of inferior rank by his laches. But if the holder of the inferior claim seeks priority, because of the laches of the holder of the superior claim, he should assert it in his pleading. The general rule is that laches must be pleaded. See 16 Cyc. 176. It is undoubtedly true that it is not always necessary to plead it. If it is plainly apparent on the complainant's own showing that he has slept too long on his rights, there is no reason for insisting that laches shall be specially pleaded. See Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. 350, 27 L. Ed. 219 (1882). But we cannot say that a delay of a few months in asserting a seaman's claim for wages is such apparent or gross laches that it makes inapplicable the general rule requiring laches to be pleaded. In The City of Tawas, supra, the contention was that claims in the third class which accrued in 1876 should be preferred over claims in the second class which accrued in 1875. Staleness of the prior claim, not having been pleaded, was not, as we have seen, allowed.

While we do not agree in the particulars stated in this opinion with the reasons given by the court below for the conclusion it reached, we think that no error was committed in directing that McCambridge's claim for wages, being of the superior rank and not shown to be stale, should be paid before the claim, inferior in rank, of William Horre & Co., although the latter claim accrued within 40 days of the filing of the libel, and the former did not.

Decree affirmed.