## THE ESTEBAN DE ANTUNANO.

CARMONA and others *v.* THE ESTEBAN DE ANTUNANO. (ALSINA and others, Intervening Libelants; MURIETTA and others, Claimants.)

*(Circuit Court, E. D. Louisiana.    June 11, 1887.)*

1. MARITIME LIENS—SHIP'S HUSBAND.
   There is no maritime lien on a ship in favor of the ship's general agent or husband.
2. SAME—FURNISHERS OF SUPPLIES.
   Supplies furnished a ship on the authority of the master in a foreign port will be presumed to have been furnished on the credit of the ship, but no lien can be given to material-men who furnished supplies on the order of the master, where the master was without authority to contract for the ship, and the material-men knew, or ought to have known, that such authority was wanting.
3. SAME—STEVEDORE.
   In this circuit a stevedore has no maritime lien upon a ship for his services in loading and stowing her cargo; following *Paul* v. *The Ilex*, 2 Woods, 229.

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

4. SAME—SEIZURE OF VESSEL—EFFECT.

When a vessel is seized by an officer, like a sheriff, and goes into the custody of the law, by such officer taking possession of her, her contemplated voyage is broken up, and thereby the authority of her owners, and of their agents, the master and ship's husband, to thereafter affect the ship by any conduct or contract, to result in a lien on the ship, is ended, and by the seizure all persons are notified of the change of control and possession.

Admiralty Appeal.

*E. D. Craig* and *Albert Voorhies*, for **libelants.**

*Bayne & Denegre*, for claimants.

*W. S. Benedict*, for intervenors.

PARDEE, J. The Mexican steam-ship Esteban de Antunano, owned by the Mexican Steam-Ship Company, in February, 1886, was running between Vera Cruz, Mexico, and New Orleans, Louisiana, carrying the mails and freight and passengers for hire. She sailed from Vera Cruz, February 6, 1886, and, after her arrival in New Orleans, discharged her cargo, reloaded with freight and passengers, took on full supplies for a round-trip voyage, took out her clearance papers, ready to sail at 8 o'clock A. M. on the seventeenth day of February. On the sixteenth day of February, Murietta & Co., bankers in London, England, alleging themselves the owners of a mortgage upon the said steam-ship, brought suit in the civil district court of the parish of Orleans, state of Louisiana, against the Mexican Steam-Ship Company, owners, for the amount alleged to be due under the mortgage, and prayed for and obtained a writ of sequestration, and on the evening of the said sixteenth of February, the sheriff of the parish of Orleans executed said writ of sequestration, and took into his possession the said steam-ship.

After various proceedings in the said civil district court, a personal judgment was rendered against the Mexican Steam-Ship Company for the amount of the mortgage, with recognition of the mortgage on the steam-ship, maintaining the sequestration, and condemning the ship to be sold for the purpose of paying the judgment and costs. Execution was issued under the said judgment, and on July 31, 1886, the said steam-ship was sold by the sheriff of the parish of Orleans, and was purchased by Murietta & Co., present claimants. Possession under this sale seems to have been given by the sheriff to Murietta & Co. on the sixth of August following. During the time of the seizure, and up to August 7th, most of the crew remained on board of the steam-ship, occupying themselves, under the direction of the master, in painting, scrubbing decks, and otherwise keeping the ship in order and condition. The seamen's wages were due from February 6, 1886. No attempt was made on the part of any one to pay and discharge them. Many of the passengers remained on board several days after the sheriff took possession, hoping, it is said, that there would be a settlement of the ship's difficulties, and that she would be able to pursue her voyage. The passengers and crew consumed the provisions supplied for the voyage, and when they ran short various parties, intervening libelants herein,

at the instance of the master, without the order of the sheriff, but with the hope that the ship's difficulties would soon end, and the voyage be made, continued to furnish supplies to meet the alleged necessities of the officers and crew, and the alleged necessity of keeping the ship in good order and condition.  No application appears to have been made to the sheriff or to the court, having possession of the ship, for authority to furnish supplies on the credit of the ship, until April 30, 1886, which was followed, after a hearing, by an order to the sheriff of the court, on May 7, 1886, to furnish provisions to the crew to the extent of $25 per day, to be paid out of the proceeds of the sale of the ship, and to cease when the ship should be sold.

June 11, 1886, while the ship was in the possession of the sheriff, Jose Carmona and 53 others, officers and crew of the said steam-ship, filed a libel for wages against the said steam-ship in the district court of the United States for the Eastern district of Louisiana, under which the marshal returns "that he seized the said ship on the thirty-first day of July, and held her in his custody until the seventh day of August, when she was released upon bond." June 14, 1886, J. M. Walsh filed an intervening libel for supplies furnished to said ship before and after the seizure of the sheriff aforesaid; and on the same day Alsina Bros. filed an intervening libel for supplies alleged to have been furnished during the aforesaid seizure of the sheriff.  On June 21, 1886, Jean Begue filed an intervening libel for supplies alleged to have been furnished before and after the aforesaid seizure of the sheriff.  June 28, 1886, Thomas Casserly filed an intervening libel for alleged services, cleaning, washing furniture, bedding, and linen of the said steam-ship during the time it was in the custody of the sheriff aforesaid.  August 4, 1886, Edward A. Yorke filed an intervening libel for alleged supplies and advances furnished said ship before and during the seizure of the sheriff aforesaid. August 4, 1886, S. C. Manning filed an intervening libel for services as a stevedore in loading said ship on the fifteenth of February, 1886, before the aforesaid seizure of the sheriff.

By the record of the state court, it appears that Casserly, Manning, and Yorke filed interventions in the state court, setting up the same claims which they now respectively set up in this court, and, after hearing and evidence, had judgment against them dismissing their said interventions, but no plea of *res judicata* has been filed against them.   The claims of the officers and crew have been settled and paid, and the questions presented here are as to the sufficiency of the claims, and the existence of the liens claimed by the intervening libelants, Yorke, Alsina Bros., Walsh, Begue, Casserly, and Manning.   .

E. A. Yorke was the ship's husband.   By his testimony it appears that he was the general agent of the ship at this port of New Orleans by appointment of the Mexican Steam-Ship Company, acting through its secretary, and that he visited the City of Mexico, and perfected his arrangements in a personal interview with the owners of the vessel, and agreed to act as her general agent in this port, transacting all her business as vice-principal, with full control of the captain of the vessel and

crew; and had agreed to pay all bills which the vessel might contract, and discharge all claims against her, Mr. Avendano being security for the Mexican Steam-Ship Company, who were to repay to him the amount advanced on the return of the vessel on her trip following the one on which he had paid the bills. His correspondence down to March 5, 1886, after the seizure of the ship, shows that he gave credit to the owners, and does not show that he relied upon the ship.

As the ship's husband, and under his contract, it was his duty and his privilege to keep liens off the ship, rather than to put them on. "The ship's husband is a confidential agent, appointed by the owners to conduct and manage on shore whatever concerns the employment of the ship. * * * He is the person to receive advances of money from the different part owners, in their respective proportions, to meet the expense of the intended voyage, or, if he lay out his own money, or make himself liable for the necessary charges of the ship before starting, he may, before the voyage is ended, sue the owners severally for their proportionate shares. His is the hand into which the gross freight at the end of the voyage is collected, and by which the expenditure of the vessel is cleared off. He is entitled to deduct the expense from the earnings of the ship for the same voyage or adventure before he distributes the net profits of the owners." Macl. Shipp. 182, 183.

"And if the ship's husband be a mere stranger, and he has regularly come to the possession of the proceeds of the voyage, or of the ship itself, if sold, or of the ship's documents and freight, he will be entitled to a lien thereon for his reimbursement and indemnity. But beyond this the ship's husband does not seem to be recognized as having any peculiar lien, or, at least, not any upon the ship or its proceeds." Story, Partn. § 443. See Abb. Ship. (6th Amer. Ed.) 133.

The adjudicated cases cited are all one way, and against permitting a maritime lien on the ship in favor of the ship's general agent or husband. See *The Larch*, 2 Curt. 427; *The Sarah J. Weed*, 2 Low. Dec. 555; *White* v. *Americus*, 19 Fed. Rep. 848; *The J. C. Williams*, 15 Fed. Rep. 558; *Minturn* v. *Maynard*, 17 How. 477.

Some reliance is placed upon *The J. C. Williams*, *supra*, as being a case where a ship's husband was allowed a lien for his advances; but an examination will show that, while the court recognized clearly and distinctly the general rule, the exception was made because the ship's agent was a mortgagee of the ship, and the agency was given him by contract as an additional security. Whether the exception was well made or not, is immaterial under the facts of the present case.

*The Patapsco*, 13 Wall. 329, and *The Lulu*, 10 Wall. 192, have been called to my attention as cases where the supreme court has been very liberal in allowing liens for supplies furnished a foreign vessel as furnished on the credit of the ship. Since those cases, if not before, the rule may be said to be that supplies furnished a ship on the authority of the master, in a foreign port, will be presumed to have been furnished on the credit of the ship, and such presumption will not be overcome except on clear evidence that the credit was given to the owners. But I

have seen no case where a lien was given to a ship's husband, as such, for advances and supplies, or to material-men who furnished supplies on the order of the master, where the master was without authority to contract for the ship, and the material-man knew, or ought to have known, that such authority was wanting.

In the present case the ship's husband so little credited the ship that he had security from the owners, and, as will be seen further on, the authority of the master was at an end—and the material-men knew it—when many of the supplies herein sued for were furnished. *The Patapsco Case*, however, answers the argument of the claimants that the supplies furnished the Antunano constituted no lien, because furnished on the credit of the ship's husband. There have been in the district courts of the United States a number of cases in which it has been held that a stevedore has a maritime lien. In the case of *The Hattie M. Bain*, 20 Fed. Rep. 389, decided in 1884, Judge BROWN, of the Southern district of New York, maintains the proposition upon principle,—relying on *Insurance Co.* v. *Dunham*, 11 Wall. 26, and upon authority; citing Judges CHOATE, *Roberts* v. *The Bark Windermere*, 2 Fed. Rep. 722; BENEDICT, *The Circassian*, 1 Ben. 209, and *The Kate Tremaine*, 5 Ben. 60; LOWELL, *The George T. Kemp*, 2 Low. Dec. 482; and DEADY, *The Canada*, 7 Fed. Rep. 119. To this list of judges so holding may be added Judge WELKER, of Ohio, who maintains the proposition on principle. *The Senator*, 21 Fed. Rep. 191.

However the case may be on principle, and on authority in other circuits, in this circuit the question is not an open one. In 1876, in the case of *Paul* v. *The Ilex*, Mr. Justice BRADLEY, circuit justice for this circuit, decided that the precedents were all one way, and that it was no longer an open question, and that "a stevedore has no maritime lien upon a ship for his services in loading and stowing her cargo." 2 Woods, 229. This decision makes the law for this circuit. Mr. Justice BRADLEY, by the way, delivered the opinion in *Insurance Co.* v. *Dunham, supra*, and it did not occur to him that that decision affected the question.

When the sheriff of the parish of Orleans, Louisiana, seized and took into his possession, under process from the state court, the steam-ship Antunano, she went into the custody of the law, and her contemplated voyage was broken up and abandoned, and thereby the authority of her owners, and of their agents, the master and ship's husband, to thereafter affect the ship by any conduct or contract to result in a lien on the ship, was ended. By the seizure all persons were notified of the change of control and possession. While the ship was in the custody of the law, it is doubtful whether on any account, or for any service, (except, perhaps, for salvage, or through a collision,) any lien could arise on the ship; certainly not without the express authority of the court having the property in possession. Liens for supplies and materials are based on contracts entered into on behalf of the ship. Where there is no representative of the ship or her owners authorized to contract, there can be no contract, and therefore no lien based on a contract. The supposed

necessities of the ship, or of her crew, would warrant no person in interfering without the authority of the sheriff or the court.

These propositions seem to be too plain to be disputed, and their recognition to be absolutely essential to preserve the authority and jurisdiction of the courts. Article 283 of the Code of Practice of Louisiana provides that "the sheriff, while he retains possession of sequestered property, is bound to take proper care of the same, and to administer the same, if it be of such nature as to admit of it, as a prudent father of a family administers his own affairs. He may confide them to the care of guardians or overseers, for whose acts he remains responsible, and he will be entitled to receive a just compensation for his administration to be determined by the court, to be paid to him out of the proceeds of the property sequestered, if judgment be given in favor of the plaintiff."

This article gave the sheriff full authority, and at the same time made it his duty to look after and provide for the necessities and preservation of the ship, and the presumption is that he did his full duties in the premises. If he did not, there was the court to appeal to, and the record here shows that the first application made (on behalf of the crew, the only alleged meritorious parties) met with a ready response. If it had been otherwise, it would not avail the intervening libelants in this case, for it was within the province of the court to determine what were the necessities of the ship, and what was necessary and proper to have done to meet such necessities. Nor is it of any avail to argue that the officers and crew were not discharged, and therefore had a right to remain aboard, and have subsistence until they were paid off and discharged, and that therefore, the material-men had a right to judge of their necessities, and to furnish, at the cost of the ship, necessary subsistence. The premises are doubtful, and the conclusions *non sequitur*.

It is probable that the breaking up of the voyage by the seizure of the ship operated, *ipso facto*, a discharge of the crew, (see *The Oder*, 2 Pet. Adm. 261;) and, if the crew thereafter remained aboard, they did it by the consent of the sheriff. In such case they would, no doubt, be entitled to their pay, and damages resulting from discharge, and the same would constitute an admiralty lien, not divested by the seizure and sale of the ship. But whatever may have been the rights of the crew to remain aboard, and have subsistence until they were paid and discharged, the court, in possession of the ship, alone could authorize supplies to the ship. The seizure of the ship, nor the sale under the mortgage, divested no maritime liens existing on the ship at the time of the seizure.

This is no case of remnants in the hands of the court, where distribution can be made to any claimant showing a better title than the owners. If any recovery can be had here, it must be on maritime liens on the ship, so as to give jurisdiction to the court, and to show a better title than the claimants. Because, as against a purchaser of a ship, there may be an outstanding maritime lienholder who properly proceeds *in rem*, it does not follow that claimants, with less than a maritime lien,

can intervene in the case, and have their claims recognized, on the theory that the release bond represents the proceeds of the ship, and that the court can distribute the amount of the bond as remnants.

These views result in the following disposition of the intervening libels in this case: Those of E. A. Yorke, Alsina Bros., S. C. Manning, and Thomas Casserly, to be dismissed, with costs; that of Jean Begue and James A. Walsh to be maintained for the amount of supplies furnished prior to February 17, 1886. As to Thomas Casserly, who appears to be the proprietor of a laundry in the city of New Orleans, where the linen of the Antunano was carried and washed during the seizure, it may be remarked that his lien on the ship for such washing would be very doubtful if there had been no seizure; but he did have a lien on the linen if he came lawfully in possession, and that lien existed until payment, provided he retained possession. He ought not to have surrendered the possession with a view of claiming a maritime lien on a ship that he did not wash.

The material-men in this case may seem to be badly treated, but it is not the fact. Each one of them furnished supplies with his eyes wide open,—or else willfully shut,—with the hope that, through some payment or settlement, the seizure of the ship would be released, and the abandoned voyage resumed. Neither the ship nor the claimants are responsible for their too sanguine expectations.

The amount due Walsh, under this opinion, as appears by the record, is the sum of $300.03, and due Begue is $226.60, with 5 per cent. interest from February 16, 1887. If there is any question as to these amounts, the matter may go to a commissioner. Yorke, Alsina Bros., Manning, and Casserly should pay the costs of their interventions respectively. The remaining costs of the district court should be paid by the claimants, and of the circuit court by Walsh and Begue, in equal proportions. Let the proctors prepare the form of the decree to be entered.