## THE ST. PAUL.

### (District Court, S. D. New York. January 10, 1921.)

1. **Shipping ⊂⊃137—Ship loading cargo for unlicensed voyage unseaworthy.**

   A ship of United States registry, licensed only for coastwise business, which loaded a cargo at New York for Mediterranean ports, *held* unseaworthy for the voyage, and the owner not entitled to any of the exemptions from liability provided by Harter Act, § 3 (Comp. St. § 8031).

2. **Shipping ⊂⊃133—Lien between ship and cargo attaches when cargo is loaded.**

   The mutual lien between ship and cargo attaches when the cargo is loaded on the vessel, and whenever any event happens which renders the lien enforceable, it relates back to that time.

3. **Shipping ⊂⊃125—Delay from seizure by marshal of unseaworthy vessel after loading held deviation.**

   Where a ship, after loading for a voyage for which she was unseaworthy, was seized and held by the marshal on process, the incident delay constituted a deviation from the voyage, which rendered the owner liable for damage to the cargo from a fire which occurred during the custody of the marshal and the sinking and subsequent salving of the vessel, and entitled the cargo owners to a lien, dating from the time of loading, for all such damage, for freight prepaid, and for the cost of loading and unloading.

4. **Maritime liens ⊂⊃37—Liens for repairs and supplies held superior to those for damage to cargo.**

   Furnishers of repairs and supplies to fit a vessel for a voyage have a lien superior to that of cargo owners for damage to cargo resulting from deviation from the voyage; but liens for freight prepaid, which put the vessel in funds for the voyage, stand on a parity with those for repairs and supplies.

In Admiralty. Suit by J. Aron & Co., Inc., against the steamship St. Paul, consolidated with other causes. Decree for libelant.

George H. Mitchell, of New York City, for repair libelant Hamilton-Beers Corporation.

Alexander & Ash, of New York City (Mark Ash, of New York City, of counsel), for repair libelants Sullivan and Baird.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for cargo libelants.

MAYER, District Judge. The essential facts are well set forth in the report of the commissioner noted in the margin.[1] The questions

[1] To the District Court of the United States for the Southern District of New York:

By an order of the court entered July 3, 1919, the above cause, and 44 other specified causes against the steamship St. Paul, were consolidated into one cause, for reasons and under circumstances stated in the order, but without prejudice to the proceedings already had in each cause, or to the priority of any libelant's claim, and it was referred to me, the undersigned, as commissioner, to take proofs and report as to the issues and all questions of priority among the libelants.

The St. Paul having thereafter been sold by the marshal under order of the court, and the proceeds of sale having been paid into the registry, a further order was made in the consolidated cause, under the above title, on March 8, 1920, whereby the first-mentioned order was modified in certain

here involved may be divided under two heads: (1) What liens attached to the vessel; and (2) the priority of the liens. Certain claims, such as those for the wages of seamen and for salvage, are not in controversy and have been disposed of. Claims for repairs, supplies, and

particulars, and it was referred to me, as commissioner, to marshal the liens of the various libelants, and to report as to the priorities among them, taking such proofs as might be material in determining the relative rank of the asserted liens, and it was ordered that such libelants as had not yet proved their damages should produce their proofs forthwith before me; the time for the production of such proofs being limited to 90 days from the entry of the order, any libelant failing to make his proofs within said period to be foreclosed from proving his claim against said proceeds, and his claim to be deemed abandoned.

Subsequently to the entry of said order of consolidation, the Steamship Operating Company, on July 23, 1919, filed a libel against the steamship St. Paul for the recovery of $41,029.97. That cause was never consolidated with the other causes, and on May 15, 1920, an interlocutory decree was entered therein, upon default, whereby it was referred to me to ascertain and report the amount due said libelant. The time to present proofs was subsequently extended as to that cause to July 12, 1920. The proofs taken therein within said extended time have been or will be filed with my report to the effect that the Steamship Operating Company had no lien on the steamship, that no amount was due to it from the proceeds, and that, if there were a lien, the same would be subordinate to the liens of the other libelants who had proved their claims.

I hereby report that, pursuant to notice given to all parties appearing of record to be interested in the distribution of said proceeds, sundry of the libelants appeared before me by their respective proctors on the 19th day of March, 1920, and on subsequent dates to which the matter was duly adjourned, and that testimony was offered which, with the exhibits, is filed herewith. Said notice of hearing, with proof of service as aforesaid, is filed herewith as Exhibit 1. I further report as follows:

The St. Paul was built at South Chicago, in 1897, for service on the lakes, and was originally operated as a lake freighter; but in 1916 she was brought to the Atlantic seaboard and made over for the coasting trade, the work of reconstruction being finished about July 1, 1917. She was then enrolled and licensed for the coasting trade under the American flag. A certificate of enrollment put in evidence shows that she was at first documented in Boston, but at the time in question was documented at New York, and that the owner was the St. Paul Steamship Company. The certificate was dated February 17, 1919. The St. Paul Steamship Company was a New York corporation.

Although the ship had never been licensed, or otherwise authorized, to go trans-Atlantic, on February 28, 1919, she began to load at Brooklyn for Mediterranean ports, and she continued to take on cargo for such ports until April 4. On April 5, when there was still some cargo to go aboard, but only a small amount, she was shifted from the pier to an anchorage off Tompkinsville, Staten Island. The explanation for the shifting is that the parties in control of the pier wanted to use the berth. In the evening of the day she was shifted she was arrested by the United States marshal for this district, under process issued on the libel filed by the Hamilton-Beers Corporation, one of the libelants in the consolidated cause, for an unpaid bill for repairs. This was followed by seizures under other libels. Later she was ordered from the Tompkinsville anchorage by the harbor authorities, and was anchored elsewhere in the Bay. She remained at this anchorage until May 26, when it was discovered that she was afire. Efforts were made by those on board to extinguish the fire; the city fire boats also came, and under orders of the fire chiefs the ship was sunk to put the fire out. She was subsequently raised by the Merritt & Chapman Derrick & Wrecking

services to the vessel aggregate apparently $25,489.49, and these claims are, without question, entitled to a lien. The sole question in respect of these claims is their position in the marshaling.

The damages of the cargo libelants include physical damage to the

Company, and under orders of the court was brought to a pier on the North River, where her cargo was discharged. All this time she was under arrest by the marshal and in his custody. The cargo was for the most part badly damaged by fire and water, the discharge and incidental expenses were heavy, and the cargo owners suffered serious losses.

The ship was twice sold by the marshal under orders of the court. The first sale was set aside for inadequacy of price. On the second sale, which took place November 24, 1919, the vessel brought $100,300, and this sale was confirmed.

The following claims for seamen's wages were proved before me under orders of reference, and were reported by me as follows: [Twenty-four claims, aggregating $2,286.98.] * * *

On August 25, 1919, the Merritt & Chapman Derrick & Wrecking Company, libelant in one of the consolidated causes, obtained a decree for salvage services rendered the steamship and her cargo in connection with the fire and sinking, and for costs amounting to $968.96; the sum of $3,000 being the award against the steamship, and the ship's proportionate share of said costs being $223.62. It is not disputed by any of the parties that said $3,000 and said $223.62, in all $3,223.62, have priority over all other decrees and claims, and that said libelant is entitled to be first paid out of the said proceeds to the extent of said sum.

In addition to those above mentioned, two classes of claims were proved before me under the orders of reference, and the same were found by me to be liens upon the steamship. All these arose subsequently to January 1, 1919, and all were in suits included in said order of consolidation. The first class consisted of claims for repairs, supplies, and services to the steamship as follows, made and rendered by the following libelants about the following dates in 1919, all at the port of New York except the first, which was at Boston: [Seventeen claims, amounting to $25,489.49.]

The second class consists of claims of cargo owners arising out of the arrest of the ship April 5, 1919, and her subsequent detention under process of the court, the fire aboard, her sinking, and matters connected therewith. Claims of this kind, made by the following libelants, were proved, and reports were made for the following amounts, no one appearing to contest in any instance: [Fourteen claims, totaling $143,210.65.]

The above damages of the cargo libelants include physical damage to the cargo by fire and water, and each shipment's proportionate share of the discharging expenses, a lien for which was imposed and has been paid. For reasons hereinafter stated, I do not think that such items are recoverable in these suits, and I now consider my reports erroneous in that respect.

It is maintained by the cargo libelants that their claims are in tort, and for that reason have priority over the repair and supply claims. The following are the grounds upon which the claim of tort is made: (1) That the owners falsely represented that the vessel had or could obtain a trans-Atlantic license. (2) Deviation of the vessel. (3) The owners allowed the vessel to lie in the lower harbor from April 4 to May 26, under-manned, and without taking proper precautions for the care of the cargo. (4) Negligence of the master in the custody of the cargo. (5) Failure of the owners to care for and discharge the cargo after the fire.

A. *As to False Representations Concerning the License.* In January, 1919, a company called the American Steamship Company, Limited, said to be a Canadian company, authorized Mr. Van Praagh, a loading agent at New York, to book the St. Paul for designated Mediterranean ports, the bills of lading to be issued in the name of another company, called Transfer Steamship Company, for which Mr. Van Praagh was to sign as agent, and which,

cargo by fire and water, and each shipment's proportionate share of discharging expenses aggregate $143,210.65. So far as concerns the physical damage to cargo, the question is whether there is any lien, and, if so, the rank to which such lien is entitled. The commissioner

it was testified, owned the American Steamship Company. It was not explained what connection these two companies had with the ship or with the St. Paul Steamship Company. A Mr. Moulton, who said he was manager of both the American Steamship Company and the Transfer Steamship Company was a reluctant witness for the cargo owners. He was evasive and insincere, and left the matter a mystery. But the inference from other testimony is that the American Steamship Company and the Transfer Steamship Company were among numerous shipping corporations controlled by Mr. Charles W. Morse, and that this was his own way of operating the ship. The St. Paul Steamship Company was also one of those corporations. In the letter authorizing Mr. Van Praagh to make the freight contracts for Mediterranean ports, the St. Paul was referred to by the American Steamship Company as a Canadian ship. Mr. Van Praagh understood she had a Canadian registry, and he testified that he was so assured. He secured the cargo and collected the prepayable freights, which he said amounted to approximately $100,000, and which he handed over to the Transfer Steamship Company. The subsequent history of this considerable sum of money is not disclosed, but it was not used to pay the bills for the contemplated voyage. Some time after the arrest of the ship Mr. Van Praagh discovered that she had no license to go trans-Atlantic, whereupon he went to Washington to investigate, after having tried to straighten out the situation in New York. He was told at the Shipping Board offices in Washington that the ship was owned by the St. Paul Steamship Company, a subsidiary of one of Mr. Charles W. Morse's companies, that Mr. Morse had sold her and three other vessels to Mr. Moulton, "apparently on a paper deal," but that the Shipping Board would not assent to the transfer to Canadian ownership and the British flag until Mr. Morse settled a claim of about $250,000 which the government had against him for other matters. He was also told that Mr. Morse had given checks to be cashed "at deferred dates," when he would probably collect freight moneys to pay them. There is no further explanation of this in the testimony. Mr. Hanscom, president of the St. Paul Steamship Company, could shed no light on the transaction. He said that he personally had little to do with the matter. He was identified with other companies in which Mr. Morse was interested.

The testimony indicates that an arrangement had been made for vesting the title to the vessel in a Canadian corporation, and obtaining a Canadian registry, and a license for trans-Atlantic traffic. Apparently this could have been done, the Canadian laws being less stringent than the United States laws, under which she could not obtain the required license without changes in her hull and equipment. I have no doubt that Mr. Morse and his associates fully expected that before the cargo was aboard the transfer would be made, and the ship put under the British flag, with a Canadian license for trans-Atlantic service. But, as no such license was ever issued, the ship must, I think, be considered to have been unseaworthy for the voyage she had undertaken, since she could not lawfully make it, and did not meet the legal requirements in hull and equipment. There was therefore a breach of the implied warranty of seaworthiness as to each cargo owner.

B. *The Deviation Alleged by the Cargo Owners.* They cite many decisions to support their contention, among them The Indrapura, 171 Fed. 929 (District Court, Oregon), decided upon exceptions to a libel for damage to cargo. There a vessel which had taken on her cargo was placed on a dry dock by the owners, to have her bottom painted, when it was not a maritime necessity. While on the dry dock the vessel caught fire, as a result of which the cargo was damaged. The court held that there was a deviation, which made the ship liable for the damage to the cargo. In a subsequent case

has reported that the cargo libelants are entitled to a lien on a parity with the repair and supply liens in respect of prepaid ocean freight, ocean insurance, cost of loading, and the estimated cost of discharging shipments in sound condition, and possibly other items which are the

arising out of the same occurrence, where it was shown that dry-docking with cargo aboard was in accordance with custom, the same judge held that there was no deviation. The Indrapura (D. C.) 238 Fed. 853. The first decision was based on the principle, apparently well established, that any conduct of a ship which tends to vary or increase the risk is to be regarded as a deviation, since it is not the risk with reference to which the parties contracted. Unreasonable delay in starting on the voyage is a deviation. The recent case of The Elizabeth Dantzler, 263 Fed. 596 (District Court, Eastern District of Virginia), is also referred to. There a vessel bound from New York to Charleston with a combustible cargo went into Hampton Roads justifiably, but she needlessly remained there for more than six weeks, and during this time the cargo was damaged by spontaneous combustion. The vessel was held liable as for a deviation. The decisions also hold that when there is such deviation the shipowner is not protected by the exceptions in the contract, but becomes an insurer, and liable for all loss and damage, even unavoidable casualty. See Carver on Carriage by Sea (6th Ed.) § 287; The Citta di Messina (D. C.) 169 Fed. 472.

It is undeniable that the shippers of the St. Paul's cargo contracted, as the cargo libelants contend, that their goods should be carried to the ports of destination in the customary manner and with the customary dispatch. The vessel had been held in the harbor for nearly two months when the fire broke out. If she had been in charge of the owners, and under their control, during that time, and not in the custody of the court through the marshal, the ship would probably be liable for all damage the cargo sustained by fire and water, and for all incidental losses; the fire clause in the Limited Liability Act (U. S. R. S. § 4282 [Comp. St. § 8020]) being no protection to the ship under such circumstances. But she finished loading April 4, went into the stream April 5, and on the same day was arrested by the marshal. She was never out of the marshal's custody again until sold at marshal's sale. I cannot see that there was a constructive deviation, and, if there was a deviation, it did not create a lien on the vessel, for reasons hereinafter stated.

C. *As to the Charges of Negligence in the Care and Protection of the Cargo, and Failure of the Owners to Attend to the Discharge after the Fire:* If the owners were in fact negligent in these particulars, I do not think that their negligence could create a lien on the vessel, since she was in the possession and custody of the law as represented by the marshal and his deputies and employees aboard the vessel, the voyage had been broken up by the seizure, and the power of the owners to create liens on the vessel had terminated. The Young America (D. C.) 30 Fed. 789; The Esteban de Antunano (C. C.) 31 Fed. 920; The Augustine Kobbe (D. C.) 37 Fed. 702; The Glen Island (D. C.) 194 Fed. 744; The Rupert City (D. C.) 213 Fed. 263; Kjaer & Isdahl v. Etier, 222 Fed. 243, 137 C. C. A. 659.

In the Esteban de Antunano, supra, it was said (31 Fed. 924): "While the ship was in the custody of the law it is doubtful whether on any account, or for any service (except, perhaps, for salvage, or through a collision) any lien could arise on the ship; certainly not without the express authority of the court having the property in possession."

Proctors for the cargo owners attempt to distinguish the cases above cited. They maintain that the expressions of the courts refer to contract liens, and do not apply to tort claims. Assuming that the cargo claims here are in tort, no such distinction has been made in the cases, and on principle no reason is apparent why there should be a distinction. It may be that the owners of the ship continued to be under a duty to watch and safeguard the cargo, the marshal's custody of the ship not being disturbed; but the failure

proximate result of furnishing an unseaworthy vessel. As might be expected, the fund in hand is insufficient to pay all claims.

1. The libels for the cargo owners were concededly brought on the contracts made by the bills of lading with the exception of two (Nichol-

to perform that duty would not give rise to a lien on the vessel, although it might create a right of action in personam against the owner.

The testimony shows that after the seizure on April 5 the crew drifted away from the vessel one or two or more at a time, because their wages were not paid, until the only man left was a colored cook. The master remained by the ship to the end, although his wages, also, were in arrears. There was also a marshal's keeper from the beginning. The captain called repeatedly at the offices of the companies supposed to be interested in the ship, but could get no action, and finally he complained to the marshal about the insufficient force aboard the vessel. This resulted in an application to the court by proctors interested in some of the claims, and an order was made on April 16 directing the marshal to secure sufficient help and provide for their keep. In consequence of this an engineer, two seamen, and a cook were procured for the marshal and put on board. The marshal was authorized by the court to take the captain and these men into his employment, and to tax their wages and keep in his costs, and these expenses were subsequently so taxed. From May 16, or shortly thereafter, the force aboard consisted of the captain and these men and the marshal's keeper, all employed by the marshal, and they were in charge when the fire broke out.

In the brief for the cargo owners it is argued at length that there was negligence in not discovering the fire sooner, and guarding against it, and in not taking seasonable measures to extinguish it; the captain particularly being criticized. The captain's deposition was taken on behalf of the cargo owners, but he was not questioned about the negligent performance of duty alleged against him. He testified that he thought the fire was due to spontaneous combustion in the coal bunkers. The charges against him are based on the testimony of the engineer and the keeper; the latter an Italian of small intelligence, scarcely able to speak English. It is doubtful that he appreciated the significance of what he said, and some of his statements were flatly contradicted by the deputy marshal, who was his immediate superior. The engineer was a garrulous and consequential person, chiefly interested in exploiting his own efficiency and alertness, and belittling everybody else aboard. He also appeared to have a strong animus against the captain. It is sufficient to say, however, that all the men aboard, the captain included, were in the employment of the marshal, and the owner had no control over them. Whether or not the owners should have provided additional men in the interest of the cargo owners is a matter with which we are not concerned here.

D. Proctors for the repair and supply libelants maintain that the Harter Act (Comp. St. §§ 8029–8035) also precludes recovery on the part of cargo owners for anything happening after the seizure. That act (section 3 [Comp. St. § 8031]), provides that the vessel and owners shall not be liable for losses arising from "seizure under legal process," if the owners have used due diligence to make the vessel seaworthy and properly equipped. Not only was there no proof of such due diligence, as required by the act, but it affirmatively appeared that the vessel was not seaworthy, as shown above. I do not think that it is necessary to show that the damage resulted from unseaworthiness, as the repair and supply libelants maintain. However, in the only reported decision applying this provision (The Brunswick, District Court, E. D. Louisiana, 263 Fed. 907), the court gave the ship the protection of the clause because there was no doubt the damage resulted solely from the seizure of the vessel under process.

E. I am therefore of the opinion that the cargo libelants are not entitled to recover against the ship for physical damage to their goods by fire and water or for anything else arising after the arrest on April 5, 1920, whatever

son File Company and Microutsicos Bros.), the form of which was in tort; the bills of lading being treated as receipts only. This court (per Judge Augustus N. Hand) denied a motion for leave to amend the libels which set forth causes of action in contract to causes of action in

their rights against the owner may be; but I think that they are entitled to recover the damages which were the proximate result of furnishing an unseaworthy vessel as above found: that is, a vessel that could not lawfully make the voyage contracted for, and was not physically fit for the same under the law of her flag. These damages should consist, I think, of the prepaid ocean freight, ocean insurance, cost of loading, and the estimated cost of discharging the shipments in sound condition. Possibly there may be other items. The testimony does not furnish information which would enable me to report the damages of the several cargo libelants on this basis.

F. The libels for the cargo owners were concededly brought on the contracts made by the bills of lading with the exception of two, the form of which was in tort, the bills of lading being treated as receipts only. It is now insisted on behalf of the cargo libelants that all the libels should be considered tort actions, and when so regarded it is claimed that they all have priority over contract claims for repairs, supplies, etc. To support this reference is made to the John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969, where it was held that a claim by a tow against the tug for damages arising out of a collision with a third vessel by reason of the tug's negligence was in tort, and had priority over a claim in contract for supplies previously furnished. The contention is of small, if any, importance if the cargo owners may recover only for breach of the warranty of seaworthiness, and the damages are limited as I have found above. In that aspect the claims of the cargo owners are on contract.

I understand that the court has denied a motion to so amend the libels which are in contract form as to make them sound in tort. Apparently the form was considered important; but it would be extraordinary to give a preference to the tort libels, and deny it to the contract libels, when the recovery in all the cases is on precisely the same state of facts. In one of the cases cited by the cargo owners it is said that in admiralty the court will determine cases upon equitable principles, and that "it is never made a point of pleading whether the case rests upon contract or tort." The California Atlantic S. S. Co. v. Central Door & Lumber Co., 206 Fed. 5, 124 C. C. A. 139. It would certainly be inequitable under the facts here disclosed to subordinate the very recent, if not contemporaneous, repair and supply claims to the cargo claims, when the former are presumed to have enhanced the value of the res and the amount of the proceeds.

G. This being an ocean-going vessel engaged in making voyages of some duration, either the "voyage" or the "yearly" rule applies. The J. W. Tucker (D. C.) 20 Fed. 129; Proceeds of The Gratitude (D. C.) 42 Fed. 299; The Glen Island (D. C.) 194 Fed. 744: The Bethulia (D. C.) 200 Fed. 876; In re New England Transportation Co. (D. C.) 220 Fed. 203; The Samuel Little, 221 Fed. 308, 137 C. C. A. 136. It is immaterial which rule is adopted, since all the liens arose between January 1 and April 5, 1919, and, with the exception of the salvage claim, all were in connection with the contemplated voyage to Mediterranean ports. All except the salvage claim were contract liens, and are therefore on a parity, except the wages claims, and those have been paid. If there is a deficiency the contract liens share in the proceeds pro rata after payment of the salvage claim in full.

Under the order of March 8, 1920, above referred to, I am directed to make a preliminary report showing the general character of the liens, to group them in classes, if that be desirable, and to report how they should be marshaled as to priority. I respectfully suggest that this be deemed the preliminary report referred to, and that, if the court should sustain my conclusions, it be referred to a commissioner to ascertain and report the damages of the cargo owners on the basis above mentioned.

tort, and the court must, on this hearing, accept that disposition as the law of this case. For reasons, however, which will appear infra, this ruling is immaterial, because the cargo rights spring ex contractu, and the fire which damaged the goods becomes immaterial as matter of law.

[1] The commissioner has found that there was a breach of the implied warranty of seaworthiness, and with that conclusion I fully agree, for the reasons stated by the commissioner, except that I am not so confident, as he is, that Morse and associates had ground to believe that the necessary license would be obtained. The commissioner, however, has found that there was no deviation from the voyage.

[2] The question brings up at once a discussion of the lien of the cargo. From the earliest times it has been established in the maritime law that a ship is bound to her cargo, and the cargo to the ship, and that the ship and cargo are so bound, and the lien attaches when the cargo is loaded on the vessel. See the interesting review in Judge Hough's opinion in The Saturnus, 250 Fed. 407: The Schooner Freeman, etc., v. Buckingham et al., 18 How. 182, 15 L. Ed. 341; Dupont de Nemours & Co. v. Vance et al., 19 How. 162. 15 L. Ed. 584; The Eddy, 5 Wall. 481, 18 L. Ed. 486; The Lady Franklin, 8 Wall. 325, 19 L. Ed. 455; The Keokuk, 9 Wall. 517, 19 L. Ed. 744.

"Undoubtedly, the owner of the cargo has a lien by the maritime law, upon the ship for the safe custody, due transport, and right delivery of the same, as much as the shipowner has upon the cargo for the freight, as expressed in the maxim, 'Le batel est obligé a la marchandise et la marchardise au batel.' Subject to the exception that the lien of the shipowner may be displaced by an unconditional delivery of the goods before the consignee is required to pay the freight, or by an inconsistent and irreconcilable provision in the charter party or bill of lading, the rule is universal as understood in the decisions of the federal courts, that the ship is bound to the merchandise and the merchandise to the ship for the performance on the part of the shipper and shipowner of their respective contracts. Shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo, contracts to pay the freight and charges, and to the fulfillment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement. * * * Such a lien is regarded as being in effect an element of the original contract. * * * Courts of justice, and text-writers, everywhere concede that the ship, under the maritime law, is bound to the merchandise and the merchandise to the ship, independent of any local usage or statute. * * *" The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772.

From the moment, therefore, that the cargo was aboard the St. Paul, the lien attached. It is argued, however, that this lien was "inchoate," in the meaning of not being perfected, because of the use of that expression in The John G. Stevens, 170 U. S. 113, 115, 18 Sup. Ct. 544, 42 L. Ed. 969. It is "inchoate" only in the sense of enforceability. In other words, the lien is discharged, ipso facto, when the ship performs its duty to the cargo. If it does not, then the enforcement "relates back to the period when it first attached"; for the lien is born and exists, until discharged, from the moment the cargo is aboard. When, therefore, the marshal seized the vessel under process, the lien still existed, and nothing which he did or might do could destroy the lien.

If it be assumed that an owner, complying with the Harter Act, is not to be held "responsible for damage or loss resulting from * * * seizure under legal process," that is not this case. The third section of the act (Comp. St. § 8031) provides:

"If the owner of any vessel transporting merchandise * * * shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting from * * * seizure under legal process."

The testimony shows that the owner did not exercise due diligence to make the vessel "in all respects seaworthy." The burden of proving compliance with the statute has not been sustained by the owner, and, indeed, the contrary is affirmatively shown. The mere fact that the ship perhaps was to receive some "cases of milk" (Seaborne, p. 4), and that, perhaps, some "cargo was left on the pier" (Barker, p. 26), does not change the situation. Neither before nor after the cargo of these libelants was loaded on the ship, did she have a license, and she never had any prospect of getting one.

She was unseaworthy at all times, and therefore the protection which is afforded to shipowners under the act, supra, cannot be invoked. The reason is plain. Just, and often unjust, claims may place the vessel in custodia legis. Where an owner has performed his duty, Congress, no doubt, realized that damage or loss resulting from seizure under legal process might visit great hardship upon, or perhaps ruin, such an owner. The exemptions of the act were, of course, intended to encourage shipping, and this was one of the safeguards; but at the same time Congress, no doubt, appreciated that, when the vessel was not seaworthy, seizure by legal process might very often be the direct result of the owner's failure, and to allow exemption in such circumstances would be to encourage, instead of discourage, violations of duty.

[3] When, therefore, in this case, the marshal seized the vessel, it still remained the duty of the owner to carry out his contract of affreightment. This, by virtue of his own wrong, he was at no time able to do. "It is undeniable," as the commissioner states, "that the shippers of the St. Paul's cargo contracted * * * that their goods should be carried to the ports of destination in the customary manner and with the customary dispatch." The failure by the ship to carry out this contract does not rest upon the fact that there was a fire. This unseaworthy ship by its own fault was long delayed before the fire. The Coventina (D. C.) 52 Fed. 156, 157.

The point, then, is that there was a deviation, and that the marshal's custody, so far as concerned delay and lack of "customary dispatch," did not affect the rights or lien of the cargo, because the owner had not exempted himself under the Harter Act, and he cannot now be heard to say there was no delay, and hence no deviation, because of seizure. The result of deviation is concisely stated by Carver in Carriage by Sea, § 287, as follows:

"When a vessel has deviated from her proper course, the shipowner is not only liable for the delay, but he becomes absolutely responsible for any loss

or damage to the goods which may occur during the deviation and which can be attributed to it. He is not protected by the exception of perils in the contract."

See The Citta di Messina (D. C.) 169 Fed. 472, 475; The Indrapura (D. C.) 171 Fed. 929 (useful for its discussion and cases cited); The Elizabeth Dantzler (D. C.) 263 Fed. 596.

The case at bar does not fall with that class of cases where the broad principle is that a lien cannot arise or be created by the owner after the ship is in the custody of the law. The Esteban de Antunano (C. C.) 31 Fed. 920; The Augustine Kobbe (D. C.) 37 Fed. 702; The Rupert City (D. C.) 213 Fed. 263. The lien, to repeat, was created the moment the cargo was loaded on the ship, and the unseaworthiness of the vessel and the deviation, constituting, as they did, breaches of contract, did not fix the date of the lien, but merely created the occasion for its enforcement.

It will be noted that the vessel, her owner et al. are relieved only from damage or loss "resulting from" seizure under legal process. In other words, the damage or loss must result from the fact that the vessel is seized under legal process. That is but another way of saying that the damage or loss must be the proximate result of the seizure. If there were no exemption in the statute, the vessel or its owner would be liable for damages resulting from delay or deviation. The fact that she was seized by legal process would manifestly prevent her, in most instances, from proceeding on her voyage with customary dispatch, and as a consequence there would be a deviation from her voyage. In the case at bar, by virtue of the seizure she was long delayed, and that delay constituted a deviation within the principles of the cases on that subject. But she would nevertheless have been excused, if seaworthy, or if her owner had exercised due diligence to make her so, and otherwise not.

On this theory of the case, it is immaterial whether the fire was caused through the negligence of the owner or not. I agree with the commissioner that there is no proof of negligence, and I accept his conclusions as to the weight to be accorded to the testimony of the various witnesses. But that does not make any difference. The fire was in no sense the result of the seizure. It was an independent occurrence, having no relation to the fact that the vessel was in the custody of the marshal, but not because it was in his custody. The fact of the seizure did not cause the fire, but it did cause delay and deviation. The ship never delivered the cargo at the ports of destination. The cargo owners, under their contract, were entitled to such delivery of their goods. To the extent that those goods were not so delivered in sound condition, and that costs and expenses were incurred in connection therewith, the cargo owners have been damaged. Because there was deviation, unexcused, because of failure of compliance with the Harter Act, the principle applies that the shipowner becomes an insurer and is liable for all loss and damage, even unavoidable casualty. Carver on Carriage by Sea (6th Ed.) § 287; The Citta di Messina, supra. Once the deviation occurs, it becomes immaterial how the damages are occasioned.

It is therefore held that the cargo owners have a lien for the physical damage and proportionate share of discharging expenses, aggregating $143,210.65, and also for the prepaid ocean freight, ocean insurance, cost of loading, and any other proper outlays made prior to the arrest.

[4] 2. *Priority.* From what has been set forth supra, it will be seen that The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969, does not apply. Except as to two cargo owners, the libels do not sound in tort; and, as had been pointed out supra, the evidence does not warrant the conclusion that the fire was caused by negligence; and, finally, such a tort, when the ship was in the marshal's custody, would not give rise to a lien against the vessel. The Esteban de Antunano (C. C.) 31 Fed. 920.

The cargo claims and the supply and repair claims thus resting on contract, the question is whether or not they should be treated in parity. In determining priorities, principles must be applied in the light of facts. It is, of course, well settled that priority of lien in point of time is not controlling, but that priority is often determined by the service rendered or the thing done. The important result to be attained is to keep the ship moving in commerce. As she starts for her destination, she must be supplied, and often repaired. As is illustrated in this case, many of these repair and supply bills are small, and those who make repairs and furnish supplies necessarily rely in whole or in part on the security of the ship. What they do is for the benefit of the ship, and without what they furnish the ship could not sail. Cargo is, of course, of high importance. The freights justify the venture and the voyage, but the cargo owner can protect himself by insurance, and safeguard his shipment in a way not open to the supply or repair men. If it were to be held, as matter of law, that the lien of cargo was always superior to that of the furnishers of supplies and the makers of repairs, great difficulty might be found in obtaining supplies and having repairs done; for, as is seen in this case, the cargo liens naturally would be so large, that they might wipe out or seriously impair the lien for repairs and supplies, and the repair and supply men might well hesitate or decline to extend credit on the faith of the ship.

In receiverships of railroads, it is a settled equitable principle that for a reasonable period prior to the receivership (in this circuit four months) those who furnish supplies and materials to keep the road going are entitled to a preference over lienors, and also over general creditors whose claims antedate the reasonable period. Surely those who make the repairs and furnish the supplies which enable the ship to sail—and "repairs and supplies have long stood upon the same basis," The Glen Island (D. C.) 194 Fed. 744, 747—are entitled to protective consideration.

There is nothing in the case at bar which indicates any laches or neglect on the part of these repair and supply lienors. Indeed, they were thoroughly diligent. It seems to me, therefore, that on the facts in this case the repair and supply claims have an equity superior to that of the cargo claims, and are of a beneficial nature higher than those of the cargo, whether for physical damage or for the items mentioned in the commissioner's report at page 15 [paragraph F], except prepaid

ocean freight. Such services are among those which "benefit the vessel, make her better, preserve her, contribute to save her, or improve her, or keep her in running or going order for the benefit of all who have prior liens or claims on her." The Frank G. Fowler (C. C.) 17 Fed. at page 656.

The prepayment of the ocean freight helps put the vessel in funds for the purposes of her voyage. A claim for such prepaid freight arising out of circumstances, such as are here disclosed, is entitled to equitable consideration on a party with claims for repairs and supplies.

There may be a decree, therefore, in accordance herewith, ordering the payment first of the repair and supply claims and the ocean prepaid freight and then ordering the payment of the balance of the cargo claims.

Settle decree on five days' notice.